305 Ga. 179
FINAL COPY

S18A1204. ELLIOTT v. THE STATE.

PETERSON, Justice.

The State is prosecuting Andrea Elliott for driving under the influence of alcohol. When Elliott was arrested, she refused to submit to a breath test. Georgia statutes allow the State to use her refusal against her in her criminal trial, and the State has sought to do precisely that. The United States Supreme Court has held that the Fifth Amendment to the United States Constitution does not bar the State from using such a refusal, in part because the Fifth Amendment gives Elliott no right to refuse to act in the first place. But we have held — and hold again today — that the protection against compelled self-incrimination provided by Article I, Section I, Paragraph XVI of the Georgia Constitution does afford the right to refuse such a test. So Elliott argues to us that Paragraph XVI gives her the protection that the Fifth Amendment does not, and thus renders invalid the portions of the statutes allowing her refusal to be admitted against her. We agree.

In Olevik v. State, 302 Ga. 228 (806 SE2d 505) (2017), we held that —
unlike the Fifth Amendment — the Georgia Constitution's right against
compelled self-incrimination prevents the State from forcing someone to submit
to a chemical breath test. Given that holding, and relying on a combination of
decisions by this Court and Fifth Amendment decisions of the United States
Supreme Court, Elliott argues that assertions of that right cannot be admitted
against her. The State argues that we were wrong in Olevik and should overrule
it, but also argues that the right — properly understood — does not prohibit the
State's use of refusal evidence against a defendant.[1] We adhere to Olevik, and,
after extensive review of the historical record and our case law, conclude that
our state constitutional right does prohibit admission of evidence that Elliott
refused a breath test.

After a review of the undisputed facts, we begin by reviewing three
principles that guide our constitutional interpretation in this case. Turning then
to the State's argument that we should overrule Olevik, a careful application of
those interpretive principles leads us to adhere to Olevik. We properly

---

[1] The efforts of both parties to this case were augmented by various amici curiae. We
appreciate the helpful briefing.

2

interpreted Paragraph XVI in the light of this Court's consistent holdings that Paragraph XVI's materially identical precursors protected defendants from being compelled to perform affirmative acts. We then review the relevant history and case law regarding admission of a defendant's refusal to act and the drawing of adverse inferences therefrom. We conclude that although the pre-Revolution English common-law right against self-incrimination did not preclude admission of defendants' refusals to incriminate themselves or adverse inferences therefrom, legal developments in the United States and specifically in Georgia in the years leading up to and around the time of the adoption of the 1877 Constitution demonstrate that the original public meaning of the 1877 Constitution's precursor to Paragraph XVI (the "1877 Provision") did preclude the admission of such evidence. Finding no basis to conclude that the meaning of Paragraph XVI itself as adopted in 1983 is different in that respect, we conclude that the Georgia statute permitting admission of Elliott's refusal violates Paragraph XVI.

I.    *Background.*

The relevant facts are not in dispute. In August 2015, a police officer stopped Elliott after observing her commit several traffic violations, including

3

a failure to maintain her lane. During the stop, Elliott admitted to consuming alcohol earlier that day. After smelling the odor of alcohol and observing several signs of impairment, including several clues during a field sobriety test, the officer arrested Elliott for DUI and other traffic offenses and read her the statutorily mandated implied consent notice. See OCGA § 40-5-67.1 (b).[2] Elliott replied that she was overwhelmed and unsure of what was happening, so the officer explained why he stopped her, why he asked her to perform field sobriety tests, why he read her the implied consent notice following her arrest, and that a refusal to submit to a state-administered breath test could result in certain consequences, including that her refusal to submit might be offered into

---

[2] The language of the implied consent notice for drivers aged 21 years or older (like Elliott) is as follows:

> Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?

OCGA § 40-5-67.1 (b) (2).

evidence against her at trial. Elliott refused to submit to a breath test and was taken to jail. She filed a motion to suppress her refusal to submit to a breath test, claiming that the introduction of that evidence at trial would violate her right against compelled self-incrimination under the Georgia Constitution and Georgia Code. The trial court denied her motion, leading to this appeal.

II.     *Principles of Georgia constitutional interpretation.*

Both Elliott's arguments challenging the denial of her motion to suppress evidence of her refusal and the State's arguments that we should reconsider our decision in Olevik require us to begin by reviewing some important principles that guide our interpretation of the Georgia Constitution in this case.

We have often explained that we interpret the Georgia Constitution according to its original public meaning. And, of course, the Georgia Constitution that we interpret today is the Constitution of 1983; the original public meaning of that Constitution is the public meaning it had at the time of its ratification in 1982. But many of the provisions of the Constitution of 1983 first originated in an earlier Georgia Constitution; unlike the United States, the State of Georgia has had ten constitutions since declaring independence from

Great Britain.[3] The meanings of those previous provisions are critical to understanding the meaning they carried at the time they were readopted. See Clarke v. Johnson, 199 Ga. 163, 166 (33 SE2d 425) (1945) ("A constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption." (citation and punctuation omitted)). Paragraph XVI first appeared in the Constitution of 1877, and was carried forward without material change into the Constitutions of 1945, 1976, and now our current Constitution of 1983. Our focus on the original public meaning of this provision thus requires us to consider two interpretive principles that arise from the provision's multi-constitutional history, and a third principle that simply arises from the independent nature of state constitutions.

---

[3] This number does not include the 1776 Rules and Regulations of the Colony of Georgia, the first governing document during the revolutionary period (although adopted three months before the signing of the Declaration of Independence). The first proper constitution was adopted a year later in 1777. See Walter McElreath, A Treatise on the Constitution of Georgia 67 (Atlanta: Harrison Co., 1912); see also Reheis v. Baxley Creosoting & Osmose Wood Preserving Co., 268 Ga. App. 256, 261 (2) n.12 (601 SE2d 781) (2004). The Constitution of 1777 was followed by the Constitutions of 1789, 1798, 1861, 1865, 1868, 1877, 1945, 1976, and 1983.

A.  *The presumption of constitutional continuity.*

Original public meaning is an interpretive principle that we apply to each of our constitutions. See Padelford, Fay & Co. v. Mayor and Aldermen of the City of Savannah, 14 Ga. 438, 454 (1854) ("[T]he Constitution, like every other instrument made by men, is to be construed *in the sense in which it was understood by the makers of it at the time when they made it*. To deny this is to insist that a fraud shall be perpetrated upon those makers or upon some of them." (emphasis in original));[4] see also Olevik, 302 Ga. at 235-236 (2) (c) (i)

---

[4] Since the people are the ultimate "makers" of the Georgia Constitution, this requires a focus on the public meaning, not the subjective intent of the drafters. See Olevik, 302 Ga. at 237-239 (2) (c) (i). All of our constitutions were the result of voter ratification or a constitutional convention whereby delegates were elected by the voters to represent them. The Constitutions of 1983, 1976, 1945, 1877, 1868, 1865, and 1861 were adopted upon voter ratification after the General Assembly or a convention proposed a new constitution. See Ga. L. 1983, p. 5188 (noting that constitution proposed by General Assembly, Ga. L. 1981, Ex. Sess., p. 143, was approved by a vote of 567,663 to 211,342); Ga. L. 1977, p. 1897 (1976 Constitution proposed by the General Assembly, see Ga. L. 1976, p. 1198, § 1, was approved by vote of 610,516 to 394,734); Ga. L. 1945, p. 8 (General Assembly proposed constitution expressly requiring voter ratification); Ga. Const. 1877, Art. XIII, Sec. II, Pars. I & II (1877 Constitution to be adopted upon voter ratification); McElreath, supra, § 115 ("The Constitution [of 1868] was adopted by a vote of 89,007 to 71,309); id., § 107 (1865 Constitution "submitted to the people for ratification and was adopted"); Ga. Const. of 1861, Art. V, Sec. VII (constitution "shall not take effect until the same is ratified by the people"). For the Constitutions of 1798 and 1777, voters elected delegates to attend a constitutional convention that created and adopted those constitutions. See McElreath, supra, §§ 53, 57, 77. The 1789 Constitution was the result of three conventions, at least one of which was composed of three delegates from each county chosen by voters. Id., supra, § 72. Of course, we do not consider the subjective intent of individual lawmakers even when the electorate's role is more attenuated. See Olevik, 302 Ga. at 235-239 (2) (c); Merritt v. State, 286 Ga. 650,

(citing cases). Because the meaning of a previous provision that has been readopted in a new constitution is generally the most important legal context for the meaning of that new provision, and because we accord each of those previous provisions their own original public meanings, we generally presume that a constitutional provision retained from a previous constitution without material change has retained the original public meaning that provision had at the time it first entered a Georgia Constitution, absent some indication to the contrary. See, e.g., Lathrop v. Deal, 301 Ga. 408, 428-432 (III) (B) (801 SE2d 867) (2017) (interpreting Art. I, Sec. II, Par. V of the Constitution of 1983 in the light of the original meaning of the provision as it first appeared in the Constitution of 1861); Ga. Motor Trucking Assn. v. Ga. Dept. of Revenue, 301 Ga. 354, 366 (2) (B) (801 SE2d 9) (2017) (interpreting provision of the Constitution of 1983 in the light of the meaning of amendments to the Constitution of 1945 that were carried forward); Smith v. Baptiste, 287 Ga. 23, 24-28 (1) (694 SE2d 83) (2010) (considering meaning of 1983 provision in part in the light of the meaning of its predecessor provisions); id. at 32-37 (2)-(3)

---

656-657 (690 SE2d 835) (2010) (Nahmias, J., concurring specially) (explaining difficulty in attempting to determine intent of legislatures).

(Nahmias, J., concurring) (same); <u>Nelms v. Georgian Manor Condo. Assn.</u>, 253 Ga. 410, 413 (2) (321 SE2d 330) (1984) (considering history of 1877 provision carried forward in the 1945 and 1976 Constitutions, and concluding that the provision's meaning remained unchanged "[a]s the language of this paragraph remained unchanged in the 1976 Constitution"); <u>Bloomfield v. Liggett & Myers, Inc.</u>, 230 Ga. 484, 484-485 (198 SE2d 144) (1973) (interpreting Art. I, Sec. I, Par. IV of the Constitution of 1945 in the light of the original meaning of the same provision in the Constitution of 1877);[5] cf. <u>Bibb County v. Hancock</u>, 211 Ga. 429, 432 (1) (86 SE2d 511) (1955) ("It is clear that, in placing [a provision from the Constitution of 1877] in the Constitution of 1945, there was no intention to declare any new principle of law, but merely to continue in the new Constitution the same provision of the old, with the same meaning."); cf. <u>State v. Central of Ga. R. Co.</u>, 109 Ga. 716, 727-728 (35 SE 37) (1900) (absent constitutional text making clear a provision was intended to change the law,

---

[5] <u>Bloomfield</u> has since been criticized as misstating the original meaning of the 1877 provision. See <u>Baptiste</u>, 287 Ga. at 42-46 (Hunstein, C. J., dissenting) (arguing that <u>Bloomfield</u> made historical errors); but see id. at 32-37 (2)-(3) (Nahmias, J., concurring) (arguing <u>Bloomfield</u> correctly stated the original meaning of the 1877 provision). But whether <u>Bloomfield</u> was right or wrong about the meaning of the 1877 provision is beside the point we make here. Here, the only point for which we consider <u>Bloomfield</u> is its unchallenged holding that the meaning of the 1877 provision — whatever that might be — was the meaning of the same provision carried forward into the 1945 Constitution.

9

constitutional text should be interpreted consistent with the common law that preceded it). This presumption of constitutional continuity helps maintain the stability of Georgia's constitutional law, while still yielding when other considerations make clear that the people have changed the meaning of a provision.

B. *A constitutional clause that is readopted into a new constitution and that has received a consistent and definitive construction is presumed to carry the same meaning as that consistent construction.*

A second interpretive implication arises from applying an original public meaning analysis to a constitutional provision that has been readopted without material change in multiple constitutions, and this principle involves our interpretations of the previous constitutions. In <u>Olevik</u>, we reasoned that "history compel[led] our conclusion" that Paragraph XVI protected individuals from being forced to perform incriminating acts. 302 Ga. at 235 (2) (c). That history revealed a consistent and definitive construction of a self-incrimination clause whose words remained materially unchanged since the clause first appeared in our constitution in 1877. See id. at 239-240 (2) (c) (ii). Given this consistent and definitive construction, we presumed that construction was carried forward into the 1983 Constitution. Id. at 241 (2) (c) (ii).

We have long applied this interpretative approach. In McKnight v. City of Decatur, 200 Ga. 611, 616 (2) (37 SE2d 915) (1946), we noted that "[t]he framers of the revised Constitution [of 1945] were presumably cognizant of the foregoing provisions of the earlier Constitutions [of 1868 and 1877, as amended in 1919], and of the interpretations which this court had placed upon them." Of course, the relevant question is not the fact of what specific legislators did or did not know; rather, the point is what was sufficiently part of the public legal context such that a presumption is appropriate.

Soon after our decision in McKnight, we explained the presumption that the framers of a new constitution are not only aware of the provisions of the earlier constitution, but when

> [they] adopt provisions contained in a former Constitution, to which a certain construction has been given, [they] are presumed as a general rule to have intended that these provisions should have the meaning attributed to them under the earlier instrument.

Thompson v. Talmadge, 201 Ga. 867, 885 (2) (41 SE2d 883) (1947). And we have applied this principle in many cases since. See, e.g., Atlanta Indep. School Sys. v. Lane, 266 Ga. 657, 658 (2) (469 SE2d 22) (1996); City of Thomaston v. Bridges, 264 Ga. 4, 6 (439 SE2d 906) (1994); Toombs County v. O'Neal, 254

11

Ga. 390, 391-392 (2) (330 SE2d 95) (1985); <u>Aldrich v. State</u>, 220 Ga. 132, 135 (137 SE2d 463) (1964); <u>Hancock</u>, 211 Ga. at 432 (1); <u>Griffin v. Vandegriff</u>, 205 Ga. 288, 293 (53 SE2d 345) (1949); see also <u>McCafferty v. Med. College of Ga.</u>, 249 Ga. 62, 70 (287 SE2d 171) (1982) (Gregory, J., concurring specially), overruled on other grounds by <u>Self v. City of Atlanta</u>, 259 Ga. 78, 79 (1) (377 SE2d 674) (1989) (adopting special concurrence).

Many of our sister states apply a similar principle. See, e.g., <u>Fla. Dept. of Revenue v. City of Gainesville</u>, 918 S2d 250, 263-264 (Fla. 2005) (adopting prior construction given to prior constitutional provision where framers of new constitution could have changed the meaning by redefining terms or using different terms altogether); <u>Succession of Lauga</u>, 624 S2d 1156, 1165 (II) (A) (La. 1993) ("When a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision."); <u>State ex rel. Ashcroft v. Blunt</u>, 813 SW2d 849, 854 (Mo. 1991) (same); <u>Paper Supply Co. v. City of Chicago</u>, 317 NE2d 3, 9 (Ill. 1974) (prior construction applies unless "it is apparent that some other meaning was intended"); <u>Richardson v. Hare</u>, 160 NW2d 883, 886 (Mich. 1968) (same); <u>First Trust Co. of Lincoln v. Smith</u>, 277 NW 762, 773

(Neb. 1938) ("[W]hen the form of words used in the Constitution is borrowed from an older source, it comes laden with its previous meaning." (citation and punctuation omitted)); Williamson v. City of High Point, 195 SE 90, 94-95 (N.C. 1938) (where provision reincorporated into new or revised constitution, "it will be presumed to have been retained with a knowledge of the previous construction, and courts will feel bound to adhere to it" (citation and punctuation omitted)); Ex parte Western Union Telegraph Co., 76 S 438, 439 (Ala. 1917) ("bound" by former construction given to a constitutional provision that was readopted into new constitution); Elliott v. Ashby, 52 SE 383, 384 (Va. 1905) ("We have, then, a judgment of this court . . . construing a provision of the Constitution and a statute passed in pursuance thereof, and the construction placed upon them has not only been unchallenged, but must be taken as having been approved by the adoption of the identical language in the Code and the Constitution."); Cline v. State, 37 SW 722, 728 (Tex. Crim. App. 1896) (constitutional provision with a settled judicial construction is presumed to have that meaning when it is incorporated into new constitution).

The State takes issue with this principle, arguing that its implications would prevent us from ever reconsidering previous decisions no matter how

13

wrong. But our longstanding articulation of this principle is not so restrictive. Indeed, in one of the first cases referring to this principle, we expressly rejected the notion that we could never reconsider such precedent. See Thompson, 201 Ga. at 885 (2) (observing that a rule that precludes a court from revisiting a previous construction is "stated more strongly than we would be willing to put it"). Instead, we explained that the better rule was that "where a constitutional provision has received a settled judicial construction, and is afterwards incorporated into a new or revised constitution, or amendment, it will be *presumed* to have been retained with a knowledge of the previous construction[.]" Id. (citation and punctuation omitted; emphasis supplied). The same rule applies to statutes. Id. at 886 (2) ("The language of an existing statute adopted into a constitution is presumed to be taken with its established construction."); see also Bradshaw v. State, 296 Ga. 650, 654 (2) (769 SE2d 892) (2015) (noting that "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well" (quoting Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A., 559 U. S. 573, 589-590 (130 SCt 1605, 176 LE2d 519) (2010)

(punctuation omitted))). The presumption created by a consistent and definitive construction "reflects the value of consistency in the interpretation of legal language." Bridges, 264 Ga. at 6.[6]

The State also argues that this principle should apply only when constitutional text is ambiguous, citing statements from this Court more than 166 years ago that the first rule of construction is that an unambiguous statute or provision "stands self-interpreted, and Courts have nothing to do but to enforce it." Neal v. Moultrie, 12 Ga. 104, 110 (1852). The State also notes similar language in Griffin. See 205 Ga. at 291 (1).

The State is wrong; when we determine the meaning of a particular word or phrase in a constitutional provision or statute, we consider text in context, not in isolation. See Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) ("The common and customary usages of the words are important, but so is their context." (citation omitted)); Brown v. State, 290 Ga. 865, 868 (2) (b) (725

---

[6] The presumption arising from a consistent and definitive construction, however, like most legal presumptions, may be rebutted. As we explain later, this presumption is not rebutted as we applied it in Olevik, and no such construction exists as to the refusal issue. Accordingly, this is not a case that calls us to articulate precisely when such a presumption may be rebutted.

SE2d 320) (2012) ("words often gain meaning from context"); see also Upper Chattahoochee Riverkeeper, Inc. v. Forsyth Cty., 318 Ga. App. 499, 502 (1) (734 SE2d 242) (2012) ("[E]ven if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the regulation as a whole."). For context, we may look to "the broader context in which that text was enacted," including other law — constitutional, statutory, decisional, and common law alike — that forms the legal background of the constitutional provision. Olevik, 302 Ga. at 236 (2) (c) (i); see also Undisclosed LLC v. State, 302 Ga. 418, 420 (2) (a) (807 SE2d 393) (2017); Gilbert v. Thomas, 3 Ga. 575, 579 (1847) (rejecting interpretation of constitutional text read in isolation because broader legal context showed that it was not "the design of the framers of the constitution"). The presumption arising from a consistent and definitive construction is simply a reflection of this principle.

C.    *Georgia constitutional provisions may confer greater, fewer, or the same rights as similar provisions of the United States Constitution, and decisions of the United States Supreme Court interpreting those similar provisions are persuasive in our interpretation of the Georgia Constitution only to the extent that those decisions are rooted in shared history, language, and context.*

When we consider the meaning of a provision of the United States Constitution, we faithfully apply the decisions of the United States Supreme Court as to the meaning of that provision. Such a faithful application is not an act of judgment on our part; it is an act of obedience. But when the provision we consider is a provision of the Georgia Constitution, our approach is different.

When interpreting a provision of our Constitution that parallels a provision of the United States Constitution, we should take seriously decisions of the United States Supreme Court that have interpreted that parallel provision. And here, the federal self-incrimination clause of the Fifth Amendment, see U. S. Const. amend. V ("No person . . . shall . . . be compelled in any criminal case to be a witness against himself[.]"), is similar to the state self-incrimination clause of Paragraph XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating."). But we owe those federal decisions no obedience when interpreting our own Constitution. "Questions of the construction of the State Constitution are strictly matters for the highest court of this [S]tate. The construction of similar federal constitutional provisions, though persuasive authority, is not binding on this [s]tate's

construction of its own Constitution." Pope v. City of Atlanta, 240 Ga. 177, 178 (1) (240 SE2d 241) (1977). And so it follows, as we observed in Olevik:

> State constitutional provisions may, of course, confer greater protections than their federal counterparts, provided that such broader scope is rooted in the language, history, and context of the state provision. In the same way, a state constitution may also offer less rights than federal law, so long as it does not affirmatively violate federal law.

Olevik, 302 Ga. at 234 n.3 (citations omitted).

This is scarcely a Georgia-specific idea. State constitutional rights were "meant to be and remain genuine guarantees against misuse of the state's governmental powers, truly independent of the rising and falling tides of federal case law both in method and in specifics." State v. Kennedy, 666 P2d 1316, 1323 (Or. 1983). See also Massachusetts v. Upton, 466 U. S. 727, 738 (104 SCt 2085, 80 LE2d 721) (1984) (Stevens, J., concurring in the judgment); State v. Walker, 267 P3d 210, 216-227 (Utah 2011) (Lee, J., concurring); Malyon v. Pierce County, 935 P2d 1272, 1281 n.30 (Wash. 1997); Sitz v. Dept. of State Police, 506 NW2d 209, 216-217 (Mich. 1993); Ex parte Tucci, 859 SW2d 1, 32

n.34 (Tex. 1993) (Phillips, C. J., concurring); State v. Smith, 725 P2d 894, 906 (Or. 1986) (plurality); Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 174-178 (2018).

And so, as we have previously explained, any decision about the scope of a provision of the Georgia Constitution must be "rooted in the language, history, and context" of that provision. Olevik, 302 Ga. at 234 (2) (b) n.3 (citing Grady v. United Govt. of Athens-Clarke County, 289 Ga. 726, 731 (2) (b) (715 SE2d 148) (2011)). Many of our constitutional provisions will find their roots in language, history, and context shared by similar provisions of the United States Constitution. And when the United States Supreme Court interprets such a provision, its decision may well shed useful light on the language, history, and context that should guide our interpretation of the similar Georgia provision. But decisions of the United States Supreme Court interpreting similar provisions generally will prove persuasive only to the extent that the Court's decisions actually were guided by that same language, history, and context.

With these guiding principles in mind, we should not simply recite holdings of the United States Supreme Court regarding the Fifth Amendment and uncritically import them into our interpretation of Paragraph XVI of the

Georgia Constitution. Rather, we must first discern the original public meaning of Paragraph XVI in order to address the merits of the parties' arguments. See Olevik, 302 Ga. at 235 (2) (c) (i) ("We interpret a constitutional provision according to the original public meaning of its text, which is simply shorthand for the meaning the people understood a provision to have at the time they enacted it."). But Paragraph XVI is a holdover from prior constitutions, and we must remember that the right against compelled self-incrimination was first constitutionalized with the adoption of the 1877 Constitution, thereby preserving a right at common law. In order to understand the meaning of the constitutional right, we must understand the nature of that common-law right as it was understood in 1877. We must also determine if a consistent and definitive construction of the constitutional right now found in Paragraph XVI applies to the issues raised here, and, if so, whether we should presume that construction was carried forward into the Constitution of 1983.

III. *We adhere to our decision in Olevik.*

Olevik posed the question of whether Paragraph XVI's mandate that "(n)o person shall be compelled to give testimony tending in any manner to be self-incriminating" applied to chemical breath tests. 302 Ga. at 235 (2) (c). In

20

answering that question, we reviewed an unbroken line of precedent beginning with Day v. State, 63 Ga. 668 (1879), and clarified in Calhoun v. State, 144 Ga. 679 (87 SE 893) (1916), that interpreted the 1877 Provision that is virtually identical to Paragraph XVI of the 1983 Constitution as barring compelled acts, not merely compelled oral or written testimony. Based on the well-established meaning given to the constitutional right against compelled self-incrimination and carried forward into subsequent state constitutions, we concluded that a breath test is an act incriminating in nature and, therefore, Paragraph XVI prohibits the State from compelling such a test. Olevik, 302 Ga. at 235-246 (2) (c).

Unhappy with our decision in Olevik and its potential implications, the State has, in this case and in other appeals currently before the Court, asked us to reconsider our decision in Olevik. In this case, the State does not challenge our conclusion in Olevik that the sustained strong blowing necessary for a breath test properly is analyzed as an affirmative act. Instead, the State challenges the holding itself, arguing that this Court's decisions in Day and Calhoun were wrong because they contravened the plain meaning of the word "testimony" found in the constitutional self-incrimination provision, and

21

because their reasons for expanding the scope of the right to include affirmative acts were based on a misunderstanding of the common-law right from which the constitutional right is derived. The State also argues that this Court stands alone in affording protection to incriminating acts, and we should start over with our interpretation of Paragraph XVI according to the plain meaning of its text — without considering the prior constructions given to the right against compelled self-incrimination — because the 1983 Constitution was a "new" constitution that was meant as a departure from established jurisprudence. The State concludes that a plain reading of Paragraph XVI would limit the right against compelled self-incrimination to only oral and written testimony, which would be coterminous with the Fifth Amendment's self-incrimination right.

Undertaking that review, we conclude that, although the scope of the common-law right against compelled self-incrimination is indeed debatable, our case law around the time the 1877 Provision was adopted had extended the right to more than oral and written testimony. That case law included our decision in Day, which research reveals was not out of step with other courts that considered the issue around the same time. Indeed, the right against compelled self-incrimination was previously understood in many courts, including federal

22

courts, to be more expansive than it is now. The fact that most of those jurisdictions have since narrowed the scope of the right against compelled self-incrimination does not require that we do the same for Paragraph XVI. We have consistently and definitively construed the right against compelled self-incrimination to bar compelled acts, and there is nothing about Paragraph XVI that rebuts the presumption that the scope of the right remains unchanged.

A.     *The common-law right against compelled self-incrimination arose from a limited context, but evolved considerably from the time of the founding of the Republic to Georgia's constitutionalization of the doctrine in 1877.*

The right against compelled self-incrimination borrowed heavily from England's common law of criminal procedure. See Charles Gardner Geyh, The Testimonial Component of the Right Against Self-Incrimination, 36 Cath. U. L. Rev. 611, 620 (1987). The English crown's deprivation of the colonists' "rights as Englishmen," including the right against compelled self-incrimination by conducting judicial proceedings that were "very inquisitional and ofttimes overbearing," was a contributing cause of the Revolutionary War. See R. Carter Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763, 783-787 (1935). And in the midst of that conflict, several states were quick to adopt constitutions that protected

23

this right, and the Fifth Amendment became part of the United States Constitution in 1791. Id. at 764-765, 787; see also Geyh, 36 Cath. U. L. Rev. at 620; Leonard W. Levy, Origins of the Fifth Amendment: The Right Against Self-Incrimination 409 (1968).

Despite the importance placed on this essential right during the founding era, the scope of the right historically is not entirely clear and has been the subject of considerable debate. See, e.g., John Fabian Witt, Making the Fifth: The Constitutionalization of American Self-Incrimination Doctrine, 1791-1903, 77 Tex. L. Rev. 825, 832 (1999) ("Scholars have had considerable difficulty explaining the original meaning of the American constitutional self-incrimination provisions — both state and federal."). But it is clear that the right had limited value at common law and in colonial America, particularly given that defendants were not allowed to testify under oath and usually were unrepresented. The right against compelled self-incrimination took on greater significance as more defendants gained access to lawyers to defend them. And as states in the new Republic began to allow defendants to testify under oath in their own defense if they wished to do so, states also afforded suspects protection from adverse comment by prosecutors if defendants declined the

option. Thus, between the time of the founding and the time Georgia adopted the 1877 Provision, the right against compelled self-incrimination took on greater relevance.

(i)     *Given the nature of criminal procedure in pre-Revolution England, the common-law right arose in a limited context, finding its roots in objections to compelled self-incrimination through torture or required oaths.*

The conventional view (which long ago found its way into our case law) is that the right against compelled self-incrimination is modeled on the maxims *nemo tenetur seipsum accusare* and *nemo tenetur seipsum prodere* (either of which might be translated, "no man is bound to accuse himself"). See Calhoun, 144 Ga. at 680; State v. Davis, 256 P3d 1075, 1079-1080 (Or. 2011). Under the *nemo tenetur* principle, which was believed to originate in the medieval canon law of the Roman Catholic Church, one was not obliged to confess punishable offenses to judges and prosecutors (although one had a spiritual obligation to reveal all sins at confession as a condition of absolution). See United States v. Gecas, 120 F3d 1419, 1436 (11th Cir. 1997). But this right against public confessions ceased to apply once a formal accusation was made, at which point it was incumbent upon the accused to prove his innocence. See id. at 1436-1437; Akhil Reed Amar & Renee B. Lettow, First Amendment First Principles: The

Self-Incrimination Clause, 93 Mich. L. Rev. 857, 896 (1995). This right became more established centuries later in response to the Star Chamber and ecclesiastical Court of High Commission, which required suspects to swear in advance to answer truthfully questions about their religious and political beliefs — forcing subjects either to lie under oath (and thereby risk eternal damnation) or refuse to take the oath (and thereby risk being whipped or pilloried). Doe v. United States, 487 U. S. 201, 212 (108 SCt 2341, 101 LE2d 184) (1988); Andresen v. Maryland, 427 U. S. 463, 470 (96 SCt 2737, 49 LE2d 627) (1976). In response to these harsh inquisitorial practices, Puritans claimed the benefit of the *nemo tenetur* principle and refused to take the oath or to testify against themselves. See Gecas, 120 F3d at 1448-1449; John H. Langbein, The Historical Origins of the Privilege Against Self-Incrimination at Common Law, 92 Mich. L. Rev. 1047, 1073 (1994).

Common-law courts at some point began to apply this principle as giving rise to a right that "no man [was] bound to incriminate himself" on "any charge" or "in any court[.]" See Davis, 256 P3d at 1080 n.2 (citing John Henry Wigmore, 4 Treatise on the System of Evidence in Trials at Common Law § 2250 (1905)). And so a defendant in colonial times was protected from being

forced to be his own accuser — although the protection ceased once an accusation was made — and such a defendant had a right against compelled self-incrimination, as long as he claimed the right. Levy, supra, at 375 ("Historically, it has been a fighting right: unless invoked, it offered no protection. It vested an option to refuse answer but did not bar interrogation nor taint a voluntary confession as improper evidence."). The right against compelled self-incrimination thus was an important limitation on the use of coercion. See Eben Moglen, Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self-Incrimination, 92 Mich. L. Rev. 1086, 1100-1101 (1994).

(ii) *Outside of the context of torture or compulsory oaths, the right against compelled self-incrimination was of limited value at common law in England and the American colonies.*

Nonetheless, any right against compelled self-incrimination had minimal value in the criminal justice systems of pre-colonial Britain and the American colonies, given pretrial investigatory procedures, defendants' legal incompetence to testify under oath, and defendants' inability to rely on counsel to make their case for them. See Moglen, 92 Mich. L. Rev. at 1092-1093, 1104. Early colonial pretrial procedure was based on British statutes that required a defendant to be examined after apprehension. See, e.g., Amar & Lettow, 93

Mich. L. Rev. at 897. When an accusation was made, a magistrate or justice of the peace would conduct a preliminary examination of the defendant, but not under oath; the defendant's statements and admissions were used at a later criminal trial; and if he refused to answer questions, his refusal could be admitted for whatever inferences might be drawn from his refusal. See Amar & Lettow, 93 Mich. L. Rev. at 897-898; Langbein, 92 Mich. L. Rev. at 1059-1062. This practice continued in England without modification until 1848, when Parliament provided that the accused must be advised that he need not answer and warned that what he said might be used against him. See Levy, supra, at 375; Langbein, 92 Mich. L. Rev. at 1061.

Defendants' incompetence to testify under oath — as well as their need to defend themselves without the aid of lawyers — made questions about the breadth of the right against compelled self-incrimination somewhat "metaphysical" as a matter of English common law through the time of the founding of America. See De Luna v. United States, 308 F2d 140, 150 (5th Cir. 1962). English law deemed the accused incompetent to testify under oath until 1898. Id. And until defendants were permitted to have counsel represent them at trial, defendants had little choice but to speak — unsworn — in their own

defense. See Gecas, 120 F3d at 1441; Langbein, 92 Mich. L. Rev. at 1049-1054.

This often resulted in an inquisitorial trial proceeding whereby the accused was bullied into answering questions. If he refused, he subjected himself to the possibility that the judge would tell the jury that the accused would have cleared himself if he were innocent. See Mitchell v. United States, 526 U. S. 314, 333-334 (119 SCt 1307, 143 LE2d 424) (1999) (Scalia, J., dissenting); State v. Bentley, 54 S2d 137, 139 (La. 1951). In England, defense lawyers were first permitted in ordinary felony trials in the 1730s, but as a practical matter were used only infrequently until the 1780s. Albert W. Alschuler, A Peculiar Privilege in Historical Perspective: The Right to Remain Silent, 94 Mich. L. Rev. 2625, 2655 (1966).

The practice of magistrates questioning accused perpetrators before trial continued in our new Republic, with suspects' silence continuing to be introduced against them at trial at least until the mid-1800s. See Mitchell, 526 U. S. at 333-335 (Scalia, J., dissenting); Amar & Lettow, 93 Mich. L. Rev. at 897-898. One exception was that the prisoner's statement could not be used against him if he were first placed under oath, perhaps reflecting the view that questioning under oath was unduly coercive, if not equivalent to torture. See

Twining v. New Jersey, 211 U. S. 78, 104 (29 SCt 78, 53 LE 97) (1908) ("[C]ommitting magistrates were authorized to take the examination of persons suspected, which if not under oath, was admissible against him on his trial[.]").

As in England, American criminal defendants in the years after the founding could not testify under oath but were nonetheless forced to defend themselves at trial without counsel. It was only in 1859, beginning with Maine, that American states began permitting criminal defendants to give sworn testimony, with every state except Georgia allowing such testimony by the end of the century. See Ferguson v. Georgia, 365 U. S. 570, 577 (81 SCt 756, 5 LE2d 783) (1961). Very few defendants were represented by counsel at the framing of the Bill of Rights and the early state constitutions. See Alschuler, 94 Mich. L. Rev. at 2656; Levy, supra, at 369; compare id. at 376 ("In the seven colonies where the right to counsel was provided even in felony cases, the right against self-incrimination was well secured in common-law trials.").[7]

(iii)   *The right against compelled self-incrimination took on increased value — and greater scope — in the early years of the Republic, as the criminal justice system changed.*

---

[7] Georgia was not one of those colonies. Levy, supra, at 376.

Although English criminal practices, as well as the English common law's narrow view of the right against compelled self-incrimination, carried over into the American colonies, American law and practice in this regard evolved considerably in the decades leading up to Georgia's adoption of a constitutional provision against compelled self-incrimination in 1877. For one thing, the nature of the privileges that comprised the common-law right against self-incrimination — the witness privilege rule, the confession rule, the rule barring defendants from testifying under oath, and the rule disqualifying interested parties from testifying[8] — changed over the course of the nineteenth century. See Witt, 77 Tex. L. Rev. at 838-906. In particular, the rule barring criminal defendants from testifying under oath eventually was abolished. See Ferguson, 365 U. S. at 577; see also De Luna, 308 F2d at 150-151; Amar & Lettow, 93 Mich. L. Rev. at 891 & n.153.

---

[8] The witness privilege protected a witness from being compelled by court process to make disclosures that might incriminate him or subject him to civil liability or moral disgrace. The confession rule excluded the admission of pretrial confessions extracted under oath or by force, threat, or promise. The rule disqualifying parties prevented criminal defendants from testifying under oath at all. And the rule disqualifying witnesses for interest disqualified witnesses based on financial interest in the outcome of the case. See Witt, 77 Tex. L. Rev. at 834.

Abolition of the rule against criminal defendants testifying under oath came with a parallel trend. Most states, at the same time they granted defendants the ability to testify, prohibited comment by the prosecution on the accused's failure to do so. See, e.g., Ferguson, 365 U. S. at 580 ("The majority of the competency statutes of the States forbid comment by the prosecution on the failure of the accused to testify, and provide that no presumption of guilt should arise from his failure to take the stand."). Although, as discussed further below in Division IV (C) (ii), Georgia was an outlier and did not deem defendants competent to testify under oath until 1962, see Ga. L. 1962, p. 133, § 2, this Court's case law reflects an understanding, prior to the end of the nineteenth century, that adverse inferences may not be drawn from a defendant's failure to make an (unsworn) statement at trial. See, e.g., Bird v. State, 50 Ga. 585, 589 (7) (1874), overruled on other grounds by Shelton v. State, 220 Ga. 610, 610 (140 SE2d 839) (1965).

In addition, the increased availability of defense counsel strengthened the right against compelled self-incrimination, as defendants could remain silent and let counsel defend them. Langbein, 92 Mich. L. Rev. at 1068-1071; Amar & Lettow, 93 Mich. L. Rev. at 897. It is against this backdrop — in which a

32

longstanding right took on new importance in changing circumstances — that Georgia adopted the 1877 Provision.

B.    *The scope of the right against compelled self-incrimination originally covered more than oral testimony.*

As discussed above, some states and the federal government constitutionalized the right against compelled self-incrimination soon after the Revolution. The state constitutions contained bills or declarations of rights that phrased their clauses in terms of a right not to be compelled to "give evidence" or to "furnish evidence." See United States v. Hubbell, 530 U. S. 27, 52 (120 SCt 2037, 147 LE2d 24) (2000) (Thomas, J., concurring) (outlining development of state and federal constitutional rights against compelled self-incrimination after the Revolution). Although the Fifth Amendment used the phrase "to be a witness" instead of the language "to give evidence" or "to furnish evidence" that was proposed by several states advocating for a bill of rights,[9] these textual differences did not necessarily reflect a difference in meaning. See id. at 50-51, 53-54 (citing legal sources and dictionaries published at the time of the founding that defined "witness" as a "person who gives or

---

[9] The federal constitution guarantees that no person "shall . . . be compelled in any criminal case to be a witness against himself." U. S. Const. amend. V.

furnishes evidence," and noting that this broad definition is consistent with the meaning given to the "same term (albeit in plural form) in the Sixth Amendment's Compulsory Process Clause"). Georgia's constitutional clause uses the term "testimony," but this semantic change also has been viewed as not altering the scope of a right rooted in centuries of history.[10] See Olevik, 302 Ga. at 239-240; cf. United States v. Burr, 25 F.Cas. 30, 34-35 (D. Vir. 1807) (Marshall, C. J.) (equating "testimony" with "evidence": "The propriety of introducing any paper into a case, as testimony, must depend on the character of the paper[.]"). These textual differences historically have been understood as

---

[10] Even prior to the adoption of the 1877 Provision, Georgia provided by statute that no one "charged" in a criminal proceeding shall be "compellable to give evidence for or against himself or herself." See Code of 1867 § 3798 (2). Similar language is found in our current Code. See OCGA § 24-5-506 (a). We have construed a prior iteration of the statute as applying "only to those who have been charged with an offense — i.e., accused in a returned or proposed charging document — at the time they are called to testify." State v. Lampl, 296 Ga. 892, 899 (2) (770 SE2d 629) (2015) (construing former OCGA § 24-9-20 (a)).

In the same section, the 1867 Code also included a subsection that was not limited to those who were "charged," providing, "No person shall be compellable to answer any question tending to criminate himself or herself." Code of 1867 § 3798 (3). Although the 1877 constitutional provision in some respects tracked this statutory provision, it differed in a key respect, in that it prohibited compelled incriminating "testimony," which is broader than the statutory reference to being compelled "to answer any question." The statutory provision later was amended to mirror the constitutional language, see Code of 1895 § 1011 (3), and was carried forward into a subsequent code, see Code of 1933 § 417. Presumably given that it was superfluous of the constitutional provision, it did not survive the adoption of the Code of 1981.

34

not reflecting a difference in meaning because they all refer to the same common law. See Twining, 211 U. S. at 92 ("[A]ll the states of the Union have, from time to time, with varying form but uniform meaning, included the privilege in their Constitutions, except the States of New Jersey and Iowa, and in those states it is held to be part of the existing law."); Counselman v. Hitchcock, 142 U. S. 547, 585 (12 SCt 195, 35 LE 1110) (1892) (reviewing federal provision and various state provisions and stating that "however differently worded, [the provisions] should have as far as possible the same interpretation"); Wigmore, supra, § 2263 ("It is therefore immaterial that the witness is protected by one Constitution from 'testifying,' or by another from 'furnishing evidence,' or by another from 'giving evidence,' or by still another from 'being a witness.' These various phrasings have a common conception, in respect to the form of the protected disclosure.").[11] And, as we discuss below, around the time the Georgia

---

[11] In Olevik, we said that Day did not explain its "broad interpretation" of the self-incrimination provision, noting that the plain meaning of the word "testimony," as that term was defined around the time the provision was first adopted in 1877, would not have covered affirmative acts. Olevik, 302 Ga. at 239 (2) (c) (ii) n.6. Our statement in Olevik should not be misunderstood as endorsing a view that terms are to be construed in isolation; such a reading would ignore other statements in Olevik in which we explained that we are to construe the text of a constitutional provision in the light of the broader legal context surrounding the adoption of that provision. See id. at 236 (2) (c) (i) (the meaning and effect of a constitutional provision "is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the

Constitution of 1877 was ratified, a prominent view was that the right against compelled self-incrimination protected the accused from being compelled to provide, do, or say anything that might tend to incriminate him. See Geyh, 36 Cath. U. L. Rev. at 621-622.

(i)    *Our precedent prior to passage of the 1877 Constitution described the scope of the right as protecting "any evidence."*

Prior to the adoption of a provision on self-incrimination in the 1877 Constitution, Georgia courts described the right against compelled self-incrimination as forbidding a "man . . . to accuse himself of any crime, or to furnish *any* evidence to convict himself of any crime[.]" Marshall v. Riley, 7 Ga. 367, 370 (1849) (emphasis in original); see also Higdon v. Heard, 14 Ga. 255, 258 (1853) ("The doctrine is well settled in England and America, that no man is bound to accuse himself of any crime; or to furnish any evidence to convict himself of any crime."). In Marshall, this Court held that the right against compelled self-incrimination, based on the common law and "considered as one of our constitutional rights" (despite there being no such express state constitutional right at that time), applied in civil proceedings and protected a

courts" (citation and punctuation omitted)). We did not consider the constructions of other jurisdictions' self-incrimination provisions in Olevik, as we do here.

36

person from being compelled to answer interrogatories that would subject him to a penalty or forfeiture or punishment for a crime, "or have a tendency thereto." Marshall, 7 Ga. at 367, 370 (syllabus).[12] Just two years after this right received express protection in our state constitution, this Court construed that provision as barring a defendant from being "compelled to [in]criminate himself by acts or words." Day, 63 Ga. at 668 (2) (syllabus).

Day's language mirrors language used in our decisions issued prior to the 1877 Constitution, and the temporal proximity of these decisions to adoption of the 1877 Constitution make them critical indicators of the original public meaning of the self-incrimination protections of that constitution. See District of Columbia v. Heller, 554 U. S. 570, 605 (128 SCt 2783, 171 LE2d 637) (2008) ("[T]he examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period after its enactment or ratification . . . is a critical tool of constitutional interpretation." (emphasis in

_____

[12] Marshall left open the question whether the right could protect a person from answering questions where he legally could not face charges (due to the alleged expiration of the statute of limitations in that case). Id. at 372-373. This Court in Higdon partly answered that question, holding that civil litigants could be compelled to answer questions, but such answers could not be used in a criminal prosecution against the individual, in order to comport with the United States Constitution (which we applied even though the Self-Incrimination Clause of the Fifth Amendment had not yet been incorporated against the states — indeed, before there was a Fourteenth Amendment). Higdon, 14 Ga. at 258-259.

original)); <u>Noel Canning v. N.L.R.B.</u>, 705 F3d 490, 501 (D.C. Cir. 2013) ("The interpretation of the Clause in the years immediately following the Constitution's ratification is the most instructive historical analysis in discerning the original meaning. Indeed, such early interpretation is a critical tool of constitutional interpretation because it reflects the public understanding of the text in the period after its ratification." (citing <u>Heller</u>, 554 U. S. at 605) (punctuation omitted) aff'd on other grounds, <u>N.L.R.B. v. Noel Canning</u>, 573 U. S. 513 (134 SCt 2550, 189 LE2d 538) (2014); <u>Ezekiel v. Dixon</u>, 3 Ga. 146, 153 (1847) ("[G]reat regard ought to be paid to the interpretation put upon a statute by the sages of the law who presided at the time, or shortly after its passage[.]").

(ii)     *Around the time <u>Day</u> was decided, the United States Supreme Court construed the Fifth Amendment as covering more than oral testimony.*

In 1886, less than ten years after passage of the 1877 Constitution, the United States Supreme Court unanimously held that compelling production of a defendant's private papers to be used as evidence against him was equivalent to compelling him to be a witness against himself in violation of the Fifth Amendment. See <u>Boyd v. United States</u>, 116 U. S. 616, 634-635 (6 SCt 524, 29

38

LE 746) (1886) ("a compulsory production of the private books and papers of the owner of goods sought to be forfeited . . . is compelling him to be a witness against himself, within the meaning of the Fifth Amendment [of] the Constitution"); see also Wigmore, supra, § 2264 ("it is universally conceded" that one may refuse production of one's documents by asserting the right against compelled self-incrimination). "[T]he Court linked its interpretation of the Fifth Amendment to the common-law understanding of the self-incrimination privilege." Hubbell, 530 U. S. at 55-56 (Thomas, J., concurring) (citing Boyd, 116 U. S. at 631-632).

Boyd was about the compelled production of existing documents, and said nothing about compelling a person to act. The United States Supreme Court later rejected the view that the Fifth Amendment protected affirmative acts, see Holt v. United States, 218 U. S. 245, 252-253 (31 SCt 2, 54 LE 1021) (1910), but for many years did not distinguish between spoken words and physical evidence reflecting written words. A shift in Fifth Amendment jurisprudence began to occur with the United States Supreme Court's decisions in Schmerber v. California, 384 U. S. 757, 760-765 (86 SCt 1826, 16 LE2d 908) (1966), where the Court held that the Fifth Amendment protects the accused only from being

compelled to testify against himself or to give evidence "of a testimonial or communicative nature," and a series of cases in the 1970s that effectively overruled <u>Boyd</u>'s rationale.[13] See Amar & Lettow, supra, 93 Mich. L. Rev. at 885-888 (describing <u>Schmerber</u> as the turning point in the Court's Fifth Amendment jurisprudence with respect to a distinction between words and physical evidence). Before this jurisprudential shift, for almost 80 years, the United States Supreme Court had construed the Fifth Amendment right against compelled self-incrimination to protect an individual from compulsory incrimination through his testimony or personal records. See <u>Bellis v. United States</u>, 417 U. S. 85, 89-90 (94 SCt 2179, 40 LE2d 678) (1974) (citing cases predating <u>Schmerber</u> that "reflect[ed] the Court's consistent view that the privilege against compulsory self-incrimination should be limited to its historic function of protecting the natural individual from compulsory incrimination through his own testimony or personal records" (citation and punctuation

---

[13] See <u>Andresen</u>, 427 U. S. at 470-477 (holding that defendant's Fifth Amendment right was not violated by introduction of business records because the statements were "voluntarily committed to writing" before police arrived and were seized pursuant to a valid search warrant); <u>Fisher v. United States</u>, 425 U. S. 391, 402-414 (96 SCt 1569, 48 LE2d 39) (1976) (holding that government could compel defendant to produce incriminating papers and Fifth Amendment protected only "testimonial" aspects of the transfer).

omitted)); see also <u>Hubbell</u>, 530 U. S. at 55 (Thomas, J., concurring) (noting that the United States Supreme Court had "not always taken the approach to the Fifth Amendment that [it] follow[s] today").

(iii) *Other states had interpreted their self-incrimination clauses to protect affirmative acts.*

If the construction of the Fifth Amendment today is narrower than it was in the last quarter of the nineteenth century, today's construction of many states' constitutional provisions has narrowed even further — they now largely mirror the Supreme Court's present interpretation of the Fifth Amendment, but began more broadly than the Fifth Amendment was ever interpreted. Despite the State's claim here that Georgia's broad self-incrimination protection is a unique outlier in this country and in other countries that have followed English common law, that same rule was quite ordinary a century ago. See Amar & Lettow, 93 Mich. L. Rev. at 884 ("[M]any courts in the late nineteenth and early twentieth centuries held that using the defendant's body as physical evidence was in effect compelling the defendant to be a witness against himself."); Geyh, 36 Cath. U. L. Rev. at 621-622 ("[A] majority of courts addressing the issue were of the opinion that the right to refuse to give evidence, to be a witness, or to testify .

41

. . meant that the accused cannot be compelled to do or say anything" that was incriminating (citation and punctuation omitted)).

From the middle of the nineteenth century through the middle of the twentieth century, at least nine states, including three of our neighboring states (Alabama, North Carolina, and Tennessee), concluded that defendants could not be compelled to perform affirmative acts that were incriminating; many of these jurisdictions cited their state constitutional provision or the common law. See, e.g., Allen v. State, 39 A2d 820 (Md. 1944) (state constitution protected the accused from being compelled to perform an evidence-producing act, such as requiring the accused, while on the witness stand, to try on a hat that had been worn by the culprit); Beachem v. State, 162 SW2d 706, 709 (Tex. Crim. App. 1942) (forcing the defendant to speak for identification purposes violated state constitution); Ward v. State, 228 P 498, 499-500 (Okla. Crim. App. 1924) (forcing the defendant to make "experiments and comparisons" in open court in presence of jury violated state constitution); State v. Height, 91 NW 935, 938-939 (Iowa 1902) (relying on cases applying self-incrimination privilege to bar results from compulsory physical exam); Cooper v. State,  6 S 110, 111 (Ala. 1888) (Alabama constitution made it "unlawful to force the witness to give

(or make) evidence against himself," and state could not accomplish the same result indirectly by having witness testify that defendant refused to make footprints for comparative analysis); Nolen v. State, 46 Am. Rep. 247 (Tex. Ct. App. 1883) (recognizing that compelled acts of defendants are as inadmissible as compelled confessions); People v. Mead, 15 NW 95, 96 (Mich. 1883) (explaining that a criminal defendant cannot be compelled to try on a shoe to determine whether tracks found at the scene of the crime were his); Stokes v. State, 64 Tenn. 619 (1875) (holding that forcing defendant to make a footprint for the jury was illegally compelled "testimony"); State v. Jacobs, 5 Jones 259, 260 (N.C. 1858) (reversing conviction where trial court forced defendant to stand up at his trial because the "generous spirit of the common law" protected accused from being compelled to furnish evidence against himself).[14]

Forty years after recognizing that affirmative acts were protected under the state's constitutional protection against compelled self-incrimination, the

_____

[14] Compare State v. Garrett, 71 NC 85, 88 (1874) (holding that coroner's testimony of the incriminating evidence that he saw when the defendant was forced to unwrap her hand did not violate defendant's self-incrimination right, and distinguishing Jacobs on the basis that, in that case, it was the prisoner who was compelled to exhibit himself to the jury). We recognize that some of these decisions involved compulsion at trial, but this does not negate the fact that the courts construed their state's self-incrimination law to cover affirmative acts. Moreover, the State in this case is asking us to do away with the affirmative act standard altogether, not simply limit it to a trial setting.

Oklahoma Criminal Court of Appeals held that the results of involuntary chemical testing in a DUI case would be inadmissible as violative of the state's constitutional self-incrimination clause that was "broad enough to encompass more than just oral testimony," and ruled that the court properly instructed the jury not to consider the results of the test if it found that the defendant did not voluntarily submit to such testing. See Cox v. State, 395 P2d 954, 956-963 (Okla. Crim. App. 1964). Several years later, Utah reached a similar conclusion that its state's constitutional ban against compelled self-incrimination covered affirmative acts. See Hansen v. Owens, 619 P2d 315 (Utah 1980) (forcing defendant to furnish a handwriting exemplar violated state constitutional self-incrimination provision).

(iv) *The meaning of our constitutional right against compelled self-incrimination does not change simply because that of other jurisdictions has changed.*

In the light of the history described above, the State's sweeping pronouncements that Day and Calhoun were uniquely out of step with the rest of the country are simply wrong. And though many jurisdictions have since abandoned their affirmative acts standard in favor of a right that is limited to the

44

present scope of the Fifth Amendment,[15] the decisions of sister states cannot change the meaning of a preexisting provision of the Georgia Constitution. One court that altered course did so without any meaningful analysis. Hill v. State, 366 S2d 318, 322 (Ala. 1979) (noting that it had abandoned its prior interpretation because the Alabama privilege "offers the same guarantee as that contained in the Federal Constitution" and "the interpretation of the [F]ifth [A]mendment in Schmerber is likewise controlling as to the interpretation of art. I, section 6 of the Alabama Constitution."). Other courts did attempt to determine the original meaning of their self-incrimination protections, relying in part on Wigmore's treatise on the issue and the United States Supreme Court's opinion in Schmerber, but there is no indication that any of them shared the same legal circumstances relevant here — a constitutional provision that had received a consistent and definitive construction and whose text was carried forward into a new constitution after that consistent construction. See, e.g., American Fork City v. Crosgrove, 701 P2d 1069, 1075 (Utah 1985) (rejecting affirmative act standard and limiting scope of self-incrimination right to

_____

[15] One scholar has posited that limiting protection became the majority view largely as a "practical consideration" due to an ever-increasing reliance on physical evidence as a form of proof. See generally Geyh, 36 Cath. U. L. Rev. at 623-628.

"evidence of a testimonial or communicative nature"); State v. Thomason, 538 P2d 1080, 1085-1086 (Okla. Crim. App. 1975) (holding that state constitutional right protects against only "testimonial compulsion or the equivalent thereof"); Olson v. State, 484 SW2d 756, 760-772 (Tx. Crim. App. 1969) (overruling Beachem after noting that its case law had been inconsistent, as some opinions sanctioned compelled affirmative acts, and that Beachem had been "seriously eroded" by subsequent cases).

And although the United States Supreme Court has said that the Fifth Amendment does not apply to affirmative acts, see, e.g., United States v. Wade, 388 U. S. 218, 221-223 (87 SCt 1926, 18 LE2d 1149) (1967); Holt, 218 U. S. 252-253, in reaching these holdings the Supreme Court of course did not have to confront even the stare decisis implications of contrary prior holdings, much less a consistent and definitive prior construction of language then essentially replicated in the constitution being applied. The situation we face is different, and so these decisions from the United States Supreme Court and other state courts shed little light on Paragraph XVI's meaning.

Similarly, we reject the State's argument that our jurisprudence is at odds with foreign jurisdictions that have adopted English common law and we should

therefore conform to the prevailing view. Of course, we may consider other jurisdictions' definition of a right that is rooted in English common law, but only to the extent those jurisdictions consider the original public meaning of those rights based on shared language, history, and context. It is the role of this Court, not the United States Supreme Court, other states' courts, or courts of foreign countries, to construe the meaning of the Georgia Constitution in the light of its particular language, history, and context.

C.     *Olevik properly applied the consistent and definitive construction presumption.*

The State argues that we were wrong in <u>Olevik</u> to give Paragraph XVI of the 1983 Constitution the same meaning that we had given to the materially identical clause in the Constitutions of 1877, 1945, and 1976. First, the State argues that we misapplied the prior construction canon referenced in <u>Olevik</u> because the canon applies only to ambiguous provisions, which the State argues Paragraph XVI is not. We rejected this argument above in Division II (B) and need not address it further. Second, the State argues that we should have interpreted Paragraph XVI according to its plain, literal meaning divorced from our prior precedent on the right against compelled self-incrimination, because

47

the Constitution of 1983 was meant as a "new" constitution that should be interpreted on its own terms. We reject the State's arguments. Olevik rightly applied the presumption that flowed from this consistent and definitive construction, because, as is explained below, there is no evidence that Paragraph XVI of the 1983 Constitution was meant to depart from the settled construction.

(i) *Our case law shows a consistent and definitive construction.*

Our case law shows that at least six of our decisions under the 1877 Constitution cited or applied the holding of Day, all of them reinforcing the construction that the self-incrimination clause protected affirmative acts, but did not prohibit taking evidence from the defendant. See Calhoun, 144 Ga. 679 (illegal seizure of items from the defendant's person did not constitute compelled production of incriminating evidence); Elder v. State, 143 Ga. 363, 364-365 (1) (85 SE 97) (1915) (ordering a new trial where jury heard evidence that defendant was ordered by sheriff to put foot in track); Dozier v. State, 107 Ga. 708, 709-711 (1) (33 SE 418) (1899) (evidence that sheriff found pistol in defendant's pocket was admissible); Evans v. State, 106 Ga. 519 (32 SE 659) (1899) (reversing for new trial where defendant compelled to put hand in pocket); Franklin v. State, 69 Ga. 36, 43-44 (3) (1882) ("inducing" defendant

48

to take off his shoes and socks did not violate right, as fact he wore decedent's shoes, and not any act he did under coercion, was the incriminating evidence); Blackwell v. State, 67 Ga. 76, 78-79 (1) (1881) (right violated where defendant was required to stand up at trial so that a witness could verify that the defendant's leg had been amputated in a way that corresponded to tracks left at the crime scene).[16]

Calhoun more clearly explained the rationale behind Day that the constitutional right was "as broad as . . . the common-law privilege from which it is derived." 144 Ga. at 680. We repeatedly relied on Calhoun for the principle that evidence taken from a defendant, as opposed to being produced by the defendant, does not violate the self-incrimination clause. See, e.g., McIntyre v. State, 190 Ga. 872, 875-876 (1) (11 SE2d 5) (1940); Herndon v. State, 178 Ga.

---

[16] In Drake v. State, 75 Ga. 413 (1885), decided after Day, we said that the constitutional provision "means that, when a person is sworn as a witness in a case, he shall not be compelled to testify to facts that may tend to criminate him." Id. at 415 (2). This statement, though sounding like a holding, was not the actual holding of the case, because the Drake Court held that taking clothing from a defendant and submitting that clothing to the jury would not violate the defendant's constitutional right against compelled self-incrimination. Id. at 413, 415 (2). This holding is consistent with the principle, laid out in subsequent cases, that the right against compelled self-incrimination is not violated where a defendant is compelled only to be present so that certain incriminating evidence may be procured from him. See Olevik, 302 Ga. at 242 (2) (c) (iii) (citing cases). Moreover, no subsequent decisions followed the reasoning of Drake by limiting Paragraph XVI to oral testimony.

832, 844 (3) (174 SE 597) (1934);[17] Hysler v. State, 148 Ga. 409, 409 (1) (96 SE 884) (1918); Groce v. State, 148 Ga. 520, 520 (1) (97 SE 525) (1918).

Our opinion in Aldrich, 220 Ga. at 134-135, reaffirmed that the 1945 Constitution, which contained the same language as the 1877 Constitution, carried forward the principle enunciated in Day and its progeny; we cited or distinguished Aldrich in at least three other cases decided prior to the adoption of the 1976 Constitution. See Strong v. State, 231 Ga. 514, 519 (202 SE2d 428) (1973) (extraction of blood did not violate right against compelled self-incrimination under Georgia or United States Constitutions), overruled in part as stated in Olevik, 302 Ga. at 232-233 (2) (a) & n.2 (noting that Williams v. State, 296 Ga. 817 (771 SE2d 373) (2015), overruled Strong's search and seizure holding but not its holding regarding Paragraph XVI); Creamer v. State, 229 Ga. 511, 515-518 (3) (192 SE2d 350) (1972) (removal of bullet from defendant did not violate Georgia right against compelled self-incrimination); Dennis v. State, 226 Ga. 341, 342 (2) (175 SE2d 17) (1970) (requirement that driver drive onto scales was not "compulsion" because there was no criminal

---

[17] In Herndon, we acknowledged that we had rejected prior requests to overrule Calhoun. See Herndon, 178 Ga. at 844-845 (3).

penalty for refusing). There were also several cases decided by this Court under the Constitution of 1976 that continued Day's and Calhoun's interpretation of the scope of the right. See Raines v. White, 248 Ga. 406, 407 (284 SE2d 7) (1981); Strickland v. State, 247 Ga. 219, 224-225 (18) (275 SE2d 29) (1981); Fouts v. State, 240 Ga. 39, 44 (3) (239 SE2d 366) (1977).

In short, the compelled self-incrimination provision at issue, which has remained materially the same since the 1877 Constitution, has received a consistent and definitive construction from its inception through the ratification of the 1983 Constitution. And

> [a]t no point through this history was the constitutional language changed to abrogate Day's interpretation, nor did we reconsider Day. To the contrary, we have *consistently* and *repeatedly* applied the state constitutional protection against compelled self-incrimination in accord with Day.

Olevik, 302 Ga. at 240 (2) (c) (ii) (emphasis added).

Indeed, even before Olevik, we continued to apply the Day/Calhoun construction of the self-incrimination right in the 1983 Constitution. Before our decision in Olevik, we referred repeatedly to the broader right afforded by Paragraph XVI compared to the right against compelled self-incrimination under the Fifth Amendment. See Bell v. State, 293 Ga. 683, 686 (3) n.4 (748 SE2d

51

382) (2013) ("[T]he Georgia provision has been construed liberally to limit the State from forcing an individual to affirmatively produce any 'evidence, oral or real,' regardless of whether or not it is testimonial." (citing Muhammad v. State, 282 Ga. 247, 250 (2) n.1 (647 SE2d 560) (2007)). And these were not just mere restatements of the law. We actually applied the Day/Calhoun affirmative act standard to Paragraph XVI, and in one instance found that the right had been violated. See, e.g., Simpson v. State, 289 Ga. 685, 687-688 (3) (715 SE2d 142) (2011) (requiring a defendant to turn over his clothes to the police for inspection did not violate the right against compelled self-incrimination); Quarterman v. State, 282 Ga. 383, 386 (4) (651 SE2d 32) (2007) (statute requiring certain convicted felons to provide a DNA sample did not violate self-incrimination right because it forced the felon "only to submit his or her body for the purpose of having the evidence removed"); Brown v. State, 262 Ga. 833, 836 (10) (426 SE2d 559) (1993) (requiring defendant to provide handwriting exemplar violated the right); Green v. State, 260 Ga. 625, 626-627 (2) (398 SE2d 360) (1990) (collection of urine — a substance naturally excreted by the human body — did not violate the right); Batton v. State, 260 Ga. 127, 130 (3) (391 SE2d 914) (1990) (removal of defendant's shoes for evidentiary purposes did not

violate right because his "presence [was] all the cooperation required"); Ingram v. State, 253 Ga. 622, 634 (7) (323 SE2d 801) (1984) (requiring defendant to strip to his waist and be photographed did not compel self-incrimination);[18] State v. Thornton, 253 Ga. 524, 525 (2) (322 SE2d 711) (1984) (the taking of dental impressions does not violate right), overruled on other grounds by Neal v. State, 290 Ga. 563, 572 (722 SE2d 765) (2012) (Hunstein, C. J., concurring, joined by all Justices).

Nothing in the cases decided under the 1983 Constitution reflects a considered departure from the consistent and definitive construction that had been placed on the self-incrimination right. In Olevik, we simply applied the presumption that flowed from the consistent and definitive construction existing prior to the 1983 Constitution, and concluded that the presumption regarding the construction of Paragraph XVI — that it covers affirmative acts — was not rebutted by a clear indication to the contrary. Olevik, 302 Ga. at 240-241 (2) (c) (ii).

The State argues that around the time of the adoption of the 1983

---

[18] The holding of Ingram was recently applied in Anglin v. State, 302 Ga. 333, 338 (4) (806 SE2d 573) (2017) to reach the same result.

Constitution, one commentator and one court asserted that Georgia had "shown signs of retreating" from the affirmative act standard. See American Fork City, 701 P2d at 1075 (citing Note, The Georgia Right Against Self-Incrimination: Historical Anomaly or Vanguard of Justice? 15 Ga. L. Rev. 1104, 1109-1113 (1981)). But none of the case law cited by the Utah court and the law student's note on which it relies — Presnell v. State, 241 Ga. 49 (243 SE2d 496) (1978), reversed on other grounds by Presnell v. Georgia, 439 U. S. 14 (99 SCt 235, 58 LE2d 207) (1978); Fouts, 240 Ga. 39; and English v. State, 234 Ga. 602 (216 SE2d 851) (1975) — actually demonstrates a clear departure from Day and its progeny.

In Presnell, we rejected the defendant's claim that testimony of an expert witness should not have been allowed because it was based upon a compelled psychiatric exam, whereby the defendant was forced to be a witness against himself as to his mental capacity. Presnell, 241 Ga. at 57-58 (7). We cited both Creamer and cases decided under the Fifth Amendment in rejecting that claim. But a careful reading shows that the defendant did not complain about performing any incriminating act; instead, he argued only that his statements were compelled. Presnell, 241 Ga. at 57 (7). Because only statements were at

issue, it is unsurprising that the Presnell Court would analyze the state and federal claims similarly, and the Court's citation to Creamer was merely to support the conclusion that certain evidence can be taken from the defendant without offending the Georgia Constitution. Id. at 57-58 (7) (noting that defendant did not claim that any incriminating statements made were admitted at trial, and concluding that his statements to a medical examiner were not testimonial in nature).[19] Thus, Presnell does not signal a retreat from Day.

In Fouts, the defendant sought to suppress the introduction of samples of his hair, which he claimed was in violation of his right against compelled self-incrimination. 240 Ga. at 43-44 (3). Fouts did not explain which constitutional right — federal or state — was at issue, but the opinion noted that the defendant had been given Miranda warnings and primarily relied on federal case law regarding testimonial protections, suggesting that only the Fifth Amendment right was at issue. Id. at 43-44 (3) (citing Creamer only as a "see also"). Similarly, in English, the Court did not identify whether the federal or state self-incrimination right was at issue, and simply cited to Creamer and Strong to summarily conclude that removal of traces of substances from a defendant's

---

[19] Whether we would reach the same outcome in Presnell today is not before us.

hands was constitutional because it was "non-testimonial evidence." 234 Ga. at 604 (3) (b). The cursory analysis in both cases cannot be taken as a reflection that we were abandoning the longstanding affirmative act standard in favor of the "testimonial" standard of the Fifth Amendment. Moreover, the removal of evidence from the defendants in Fouts and English would not have qualified as compelled affirmative acts protected by Georgia's constitutional right against compelled self-incrimination. Thus, these cases do not negate the consistent and definitive construction that had existed up through the adoption of the 1983 Constitution.

(ii) *Nothing in the adoption of the 1983 Constitution rebuts the consistent and definitive construction of Day and its progeny.*

The State argues that, in the absence of evidence that the public understood the full scope of the provision that became Paragraph XVI and the lack of evidence that the voters accepted or rejected the given meaning of the former provision when ratifying the 1983 Constitution, we should presume that the voters understood the right against compelled self-incrimination as applying only to oral testimony. But contrary to the State's argument, it is "the understanding of the text by reasonable people familiar with its legal context"

56

that is important, not whether every citizen understood the particular meanings of a constitutional provision. See Jerman, 559 U. S. at 607 n.1 (Scalia, J., concurring in part and concurring in the judgment) ("[W]here . . . many federal courts have read [certain text in a given] way . . . it could be said that such uniform and longstanding judicial interpretation had established the public meaning of the text, whether the Members of Congress were aware of the cases or not. That would be the understanding of the text by reasonable people familiar with its legal context."); Baptiste, 287 Ga. at 32-33 (Nahmias, J., concurring) (explaining that contemporaneous sources are useful in seeking to interpret the meaning of a constitutional text "because they demonstrate what intelligent and informed people at the time understood the language . . . to mean"). Day and its century-long progeny were sufficiently consistent and definitive such that the legal context of the text of Paragraph XVI extended to affirmative acts.

The State also argues that we erred in Olevik because we ignored the "realities that surrounded the ratification of" the 1983 Constitution. First, the State argues that the 1983 Constitution was ratified not as an amendment to existing organic law, but as an entirely new constitution that should be read

anew according to its plain language. In support, the State cites to a provision

that repealed "all previous Constitutions and amendments thereto," see Ga.

Const. 1983, Art. XI, Sec. I, Par. VI, and to various statements — some made

near the time of ratification and some made in March 2018 — that the 1983

Constitution was meant as a "new and revitalized organic law" that should

"stand on its own terms."[20] The fact that certain individuals labeled the 1983

Constitution as "new," or even "revitalized," does not rebut the presumption

arising from Day's consistent and definitive construction. We had characterized

the 1945 Constitution as "new," see Wheeler v. Bd. of Trustees of Fargo

Consolidated School Dist., 200 Ga. 323, 330 (2) (37 SE2d 322) (1946), and yet

determined the meaning of certain provisions of that constitution by applying

the prior constructions of similarly worded provisions found in the 1877

Constitution, see, e.g., Aldrich, 220 Ga. at 133-134 (determining meaning of

self-incrimination clause and citing cases interpreting and decided under 1877

Constitution); Hancock, 211 Ga. at 432 (construction of provision of 1877

_____

[20] In March 2018, the State, apparently for purposes of this appeal, interviewed two of the many people instrumental in creating the 1983 Constitution and reported that they opined that the 1983 Constitution was meant to be "new" and was to "stand" or "be looked at" on its own terms. As we discussed in Olevik, this sort of subjective legislative intent has little relevance, especially for a constitution ratified by the voters. Olevik, 302 Ga. at 237-238 (2) (c) (i).

58

Constitution regarding purposes for which counties may levy taxes was controlling as to meaning of same provision in 1945 Constitution). To presume that the meaning of text changes simply because it is readopted in a "new" constitution ignores the heavy emphasis courts place on history and context in interpreting text.

And even for those who may believe that the subjective views of individual drafters are relevant, there is no evidence whatsoever that the "new" 1983 Constitution was meant to wipe away nearly 200 years of Georgia constitutional law. To the contrary, the transcripts from the various meetings of the committee charged with revising Article I (our Bill of Rights) showed that the committee meant to keep existing law — even if all of the implications of the language were not fully explored or even understood — unless otherwise stated. See, e.g., Select Committee on Constitutional Revisions, 1977-1981 ("Select Committee"), Transcript of Meetings, Committee to Revise Article I, meeting of the Subcommittee to Revise Section I, Oct. 4, 1979, pp. 3-4 (Justice Jesse Bowles, subcommittee chairman, noting that Georgia's Bill of Rights had remained "pretty much" the same since the first constitution and proposing that the committee review the 1976 Constitution "paragraph by paragraph" and

revise as necessary). Moreover, there was acknowledgment that many of the rights enshrined in the Bill of Rights came from the English common law. Id., meeting of the Subcommittee on Origin and Structure of Government, Oct. 26, 1979, p. 54.

Some committee members also expressly admitted that they did not understand the meaning of certain clauses of the Bill of Rights. The committee nevertheless elected not to change the words of such clauses, because to do so would signal that a change was intended. Id., meeting of Subcommittee to Revise Section I, Oct. 4, 1979, p. 69 (noting that the search and seizure clause had "been construed so many times" and a "tremendous body of law" developed on the words of that clause that "if we change much of that we're going to open a complete new field"); id., p. 97 (noting that the committee would "open up a keg of worms" if it "monkey[ed] with" the double jeopardy clause); id., pp. 103-106 (notwithstanding members' uncertainty about meaning of phrase "corruption of blood," Justice Bowles noted that the phrase had been defined in case law, and another committee member suggested the phrase remain in the light of that case law); id., meeting of Subcommittee on Rights of Persons, Oct. 25, 1979, p. 51 (Justice Bowles noted "change should be made where change is

necessary but" courts view a change in words as "an intention on the part of the framers to give it a different meaning from the meaning that theretofore existed"); id., Nov. 9, 1979, meeting of Full Committee, pp. 22-29 (one committee member proposed removing the word "remonstrance" from provision on right to assemble and petition, but majority of committee voted to keep the provision as written after argument was made that the alternative language omitting the word would narrow the right). This evidence shows that, rather than starting with a clean slate, the framers of the 1983 Constitution generally understood themselves to be proposing the preservation of existing law when they left language unchanged.

In conclusion, none of the State's arguments discussed above undermines the soundness of Olevik. Although we do not determine conclusively that Day was correctly decided, that case (and others like it) established a well-settled interpretation of the self-incrimination right, one that was not unique but within the mainstream of American judicial decisions at the time. That interpretation was carried forward into subsequent Georgia Constitutions, and there was no error in Olevik in concluding that Paragraph XVI preserved the protections of prior constitutional self-incrimination provisions because the previous

provisions were materially identical.[21] Thus, <u>Olevik</u> rightly decided that Paragraph XVI covers state-administered breath tests. Now that we have concluded that <u>Olevik</u> should stand, we must address the consequence of <u>Olevik</u> that this case presents: does Paragraph XVI prohibit the State from admitting into evidence Elliott's exercise of her constitutional right to refuse to submit to a breath test, as OCGA §§ 40-5-67.1 (b) and 40-6-392 (d) say the State may do?

IV.  *Admission of evidence that a defendant refused to submit to a chemical test of breath pursuant to OCGA § 40-5-67.1 (b) violates Paragraph XVI of the Georgia Constitution.*

Our reaffirmance of <u>Olevik</u> means that Elliott's refusal to submit to a breath test fell within the protections of Paragraph XVI. But that does not necessarily mean that introduction of evidence of that refusal at trial violates Paragraph XVI. That issue presents a separate question. After thorough review of the relevant history and case law, we conclude that the admission of such a refusal violates Paragraph XVI.

The pre-Revolution English common-law right against compelled self-

---

[21] Because we conclude that <u>Olevik</u> was correctly decided, it is unnecessary to consider whether we should retain that decision under the doctrine of stare decisis. See <u>Kimble v. Marvel Entertainment, LLC</u>, ___ U. S. ___, ___ (135 SCt 2401, 192 LE2d 463) (2015) ("*stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up").

incrimination did not preclude admission of a defendant's refusal to incriminate herself or adverse inferences therefrom. And the text of Paragraph XVI does not by its plain terms preclude admission of evidence that a defendant refused to speak or act. But legal developments in the century between the Revolution and our state's adoption of the 1877 Provision — in particular, decisions of this Court preceding and contemporaneous with that adoption — support the conclusion that the 1877 Provision prohibited admission of a defendant's invocation of his privilege against compelled self-incrimination. We find nothing sufficient to rebut the presumption that the 1983 Constitution incorporated this meaning and thus conclude that Paragraph XVI generally prohibits admission of a defendant's pretrial refusal to speak or act. And we conclude that OCGA §§ 40-5-67.1 (b) and 40-6-392 (d) violate the Georgia Constitution by allowing the admission of a defendant's refusal to submit to a breath test to prove that the defendant had been drinking alcohol.

A.     *The United States Supreme Court's interpretation of the Fifth Amendment is unpersuasive as to the meaning of the Georgia Constitution on this point.*

To be clear, this conclusion is not dictated by the United States Supreme Court's decision in Griffin v. California, 380 U. S. 609 (85 SCt 1229, 14 LE2d

106) (1965), in which that Court held that the Fifth Amendment barred state prosecutors from commenting on a defendant's failure to testify. To the extent that such a decision was rooted in text, history, and context shared by the 1877 Provision, it would be persuasive as we determine the original public meaning of that provision. But Griffin was not so rooted; indeed, it has been met with considerable criticism since the day it was decided on the ground that it "lacks foundation in the [federal] Constitution's text, history, or logic." Mitchell, 526 U. S. at 341-343 (Thomas, J., dissenting); see also, e.g., id. at 331-341 (Scalia, J., dissenting, joined by Rehnquist, C. J., and O'Connor and Thomas, JJ.); Carter v. Kentucky, 450 U. S. 288, 305-307 (101 SCt 1112, 67 LE2d 241) (1981) (Powell, J., concurring); Griffin, 380 U. S. at 617-623 (Stewart, J., joined by White, J., dissenting). To the extent the Fifth Amendment and Paragraph XVI (and its predecessors) share some textual features, Griffin is unhelpful to our task because it contains no textual analysis. And to the extent that it considered the context and history of the Fifth Amendment (which it does not appear to have done, either), it certainly is not definitive as we consider the history and context of the 1877 Provision, because, as discussed below, the history and context of the Fifth Amendment is different from the history and context of the

1877 Provision. Thus, Griffin cannot answer the question before us today, and we must undertake our own analysis.

B.    *Although the text of the 1877 Provision considered in isolation does not clearly preclude admission of evidence that a defendant refused a breath test, that does not end our analysis of the provision's meaning.*

Although the state constitutional provision at issue here is sometimes referred to as embodying a right against self-incrimination, by its text the 1877 Provision prohibited only "compelled" self-incrimination. Paragraph XVI also uses the term "compelled." "Compel" is generally defined as to "constrain" or "force" a person to do something. See Webster's New World Dictionary 289 (2d College ed. 1980).[22] Just as asking a person to take a breath test, without more, is not compelling that person to do any act, admission of evidence of a defendant's refusal to submit to a breath test does not fit within a natural understanding of the word "compel." Rather, such a refusal merely is a consequence of a DUI arrestee's choice between two options. Both options are decidedly unpalatable given that both likely would result in incriminating evidence: agree to the breath test and risk an incriminating result, or refuse and

---

[22] At the time of the 1877 Constitution, the term "compel" similarly was defined as "[t]o drive or urge *irresistibly*" or "[t]o take by *force*." Noah Webster, A Dictionary of the English Language 80 (1878) (emphases added).

65

face driver's license suspension and the risk that a jury will assume the arrestee had been drinking. But this poor option set is merely a consequence of there being probable cause to arrest a person for driving under the influence. And making a choice between two unpalatable options is still a choice. See McGautha v. California, 402 U. S. 183, 213 (91 SCt 1454, 28 LE2d 711) (1971) ("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (citation and punctuation omitted)); State v. Modlin, 867 NW2d 609, 620 (Neb. 2015) (citing cases from several jurisdictions for proposition that although the legal consequences of an administrative license revocation make refusal of a chemical test a difficult choice to make, "the difficulty of such choice does not render consent involuntary"), cited in Kendrick v. State, 335 Ga. App. 766, 772 (782 SE2d 842) (2016).

But as we explained in Division II, we do not read the text in isolation; rather, "[w]e interpret a constitutional provision according to the original public

meaning of its text," Olevik, 302 Ga. at 235 (2) (c) (i), which requires considering its context. Where, as here, a constitutional provision incorporates a pre-existing right, the provision cannot be said to create that right — it merely secures and protects it. See Nunn v. State, 1 Ga. 243, 249 (1846) (relying on constructions of other states' constitutional provisions securing right to bear arms in construing Second Amendment, because "these instruments confer no *new rights* on the people which did not belong to them before" (emphasis in original)). And where the right enshrined in the constitution was one found at common law, that constitutional right is understood with reference to the common law, absent some clear textual indication to the contrary. See Virginia v. Moore, 553 U. S. 164, 168 (128 SCt 1598, 170 LE2d 559) (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); United States v. Wong Kim Ark, 169 U. S. 649, 654 (18 SCt 456, 42 LE 890) (1898) ("The language of the Constitution, as has been well said, could not be understood without reference to the common law."); Central of Ga. R. Co., 109 Ga. at 728 ("In construing a constitution, a safe rule is to give its words such significance as they have at common law; especially if there is nothing in the instrument to indicate an

intention by its framers that the language in question should have a different construction."). We thus proceed to consider pre-Revolution English common law on the right against compelled self-incrimination, then subsequent developments that provide important context for the original public meaning of the 1877 Provision.

C.    *The historical record prior to Georgia's adoption of the 1877 Provision indicates the provision prohibited admission of a defendant's refusal to incriminate herself or the drawing of adverse inferences therefrom.*

The pre-Revolution English common-law right did not preclude admission of a defendant's refusal to incriminate herself or adverse inferences therefrom. But the second half of the nineteenth century was a time of great change in the American criminal justice system. And decisions of this Court in the years leading up to, and around the time of, the adoption of the 1877 Provision indicate a significant deviation from the common law of England on the question of whether a defendant's silence could be presented as evidence of guilt. We thus conclude that the original public meaning of the 1877 Provision prohibited admission of a defendant's refusal to incriminate herself or the drawing of adverse inferences therefrom.

(i)    *Inferences from refusal to testify were permissibly drawn at common*

68

*law.*

The common law as it was understood in 1776 does not support construing the 1877 Provision as forbidding admission of a defendant's refusal to incriminate herself or the drawing of adverse inferences therefrom. The common law as it was understood in 1776 did not prohibit a trial court from admitting evidence that a defendant refused to speak or otherwise provide incriminating evidence against himself. And it did not prohibit jurors from drawing adverse inferences from such a refusal. Until 1848, English magistrates would conduct preliminary examinations of defendants without advising them that they need not answer or that their unsworn statements could be used against them in a later trial. See Langbein, 92 Mich. L. Rev. at 1060-1061. If the defendant refused to answer questions, his refusal could be admitted, and any adverse inferences might be drawn therefrom. See id. at 1061-1062. The question of whether adverse inferences could be drawn from the accused's failure to "testify" at trial did not even arise, as defendants were deemed incompetent to testify under English law until 1898. See De Luna, 308 F2d at 150. Moreover, defendants' inability to rely on a lawyer to speak for them meant that a failure to speak amounted to no defense at all. See Langbein, 92 Mich. L.

Rev. at 1049-1053. And if a defendant did fail to answer questions, he risked the jury, with the judge's blessing, drawing an inference that his silence was indicative of guilt. See Mitchell, 526 U. S. at 333-334 (Scalia, J., dissenting); Bentley, 54 S2d at 139; Alschuler, 94 Mich. L. Rev. at 2631. Thus, had the 1877 Provision afforded constitutional protection to the common-law right as it was understood in 1776, that provision would not have precluded the admission of — or an instruction that the jury may draw adverse inferences from — a defendant's failure to testify. But that is not what the 1877 Constitution did.

(ii) *Developments between the time of Georgia's adoption of the common law of England and our ratification of the 1877 Constitution indicate that the 1877 Provision barred admission of a defendant's refusal to speak or act.*

By the end of the nineteenth century, American jurisdictions generally experienced a shift in the admissibility of defendants' refusal to incriminate themselves. The practice of magistrates questioning the accused before trial, with suspects' silence being used against them at trial, continued in America into the 1800s. See Mitchell, 526 U. S. at 333-335 (Scalia, J., dissenting); Amar & Lettow, 93 Mich. L. Rev. at 897-898. And to the extent that defendants declined to make a statement at trial, the practice of drawing an adverse

70

inference persisted into the 1800s as a general matter. See Alschuler, 94 Mich. L. Rev. at 2631. But by the end of the nineteenth century every state but Georgia had given defendants the ability to testify under oath. See Ferguson, 365 U. S. at 577. And at the same time they granted defendants competency to testify, most states prohibited comment by the prosecution on the accused's failure to do so. Id. at 580; Wigmore, supra, § 2272 ("In the United States, almost universal legislation has decreed, in varying phraseology, that the inference shall not be availed of."); see also, e.g., State v. Williams, 75 NW 815, 817 (S.D. 1898); State v. Pearce, 57 NW 652, 655 (Minn. 1894); State v. Baldoser, 55 NW 97, 98 (Iowa 1893); Staples v. State, 14 SW 603, 603 (Tenn. 1890); Hunt v. State, 12 SW 737, 737 (Tex. App. 1889); Long v. State, 56 Ind. 182, 186 (1877).[23]

Georgia in at least one sense was an outlier, prohibiting defendants from testifying under oath in their own defense at trial until 1962. See Ga. L. 1962,

---

[23] Perhaps more consistently with English common law, it also was fairly clear in American courts by the latter half of the nineteenth century that no adverse inferences could be drawn from the silence of a witness who was not a criminal defendant. See Greenleaf on Evidence, at § 451 (11th ed. 1863) ("If the witness declines answering, no inference of the truth of the fact is permitted to be drawn from that circumstance."); see also People v. Maunausau, 26 NW 797, 798-799 (Mich. 1886); Phelin v. Kenderdine, 20 Pa. 354, 363 (1853); Rose v. Blakemore, 7 Geo. IV 382, 383-384 (1826).

pp. 133, 135, § 2. In the meantime, defendants could make only an unsworn "statement" on their own behalf. See Code of 1873 § 4637 (as amended by Ga. L. 1874, pp. 22, 22-23, § I) ("In all criminal trials in this State, the prisoner shall have the right to make, to the Court and Jury, such statement in the case as he or she may deem proper, in his or her defense, said statement not to be under oath, and to have such force only as the jury may think right to give it: *Provided*, the prisoner shall not be compelled to answer any questions on cross-examination, should he or she think proper to decline to answer such questions.").[24] And it was not until defendants were afforded competency to testify that the legislature explicitly prohibited commenting on a defendant's

_____

[24] A similar rule applied to pretrial questioning by magistrates. An 1860 statute provided that the magistrate "shall always permit the defendant to make his own statement of the transaction (not under oath), if he desires to do so" and that "[w]henever such statement is made, it shall be the duty of the court to reduce it to writing, and return it with the other papers to the Superior Court, in the event of a commitment." Code of 1860 § 4614. But the statute did not specify whether an accused's refusal to answer questions could be admitted at trial. Id. An 1819 Georgia justice of the peace manual indicates that an accused's answers to pretrial questioning by a magistrate should be admitted at trial, as long as his answers were not given under oath or extracted by threats or promises, but, again, did not explicitly address refusals to speak. See Augustin S. Clayton, The Office and Duty of a Justice of the Peace: and a Guide to Clerks, Constables, Coroners and Other Civil Officers According to the Laws of the State of Georgia 92, 122, 127 (Milledgeville: S. Grantland, 1824) (providing that if an accused had been sworn before being examined, his answers could not be used against him at trial — "because that is making a party a witness against himself" — and that confessions induced by "threats or promises" were inadmissible as well).

failure to speak in his own defense, providing that "[t]he failure of a defendant to testify shall create no presumption against him, and no comment shall be made because of such failure." Ga. L. 1962, pp. 133, 135, § 1.[25]

Nonetheless, decisions of this Court prior to the adoption of the 1877 Provision, consistent with those of other jurisdictions at the time, indicate that it was impermissible to draw adverse inferences from a defendant's failure to make such a statement. In 1874, this Court overturned a criminal conviction when the jury was charged that it might consider the defendant's refusal to make a statement at trial. See Bird, 50 Ga. at 589 (7). This decision appeared to reflect the Court's view that allowing a defendant to make a statement, but forbidding him from testifying, did defendants more harm than good. The Court noted it did "not think that the statute giving this right to a defendant intended that it should be counted against him, if he did not avail himself of it," and the authoring Justice observed that he had "never known or heard of but one instance where it supposed that the right had availed anything" and thus it would be "terrible" if a defendant's failure to speak could be considered against him. Bird, 50 Ga.

---

[25] This statutory provision, with slight alteration, can now be found in OCGA § 24-5-506 (b), which provides: "The failure of an accused to testify shall create no presumption against the accused, and no comment shall be made because of such failure."

at 589 (7). And two years later — the year before Georgia adopted the 1877 Constitution — we reversed a conviction because the trial court had allowed the prosecutor to argue that the defendant's objection to being required to produce certain papers amounted to an admission of guilt. See Russell v. State, 57 Ga. 420, 423-424 (4) (1876). We reasoned that the trial court had improperly endorsed, rather than corrected, the State's improper argument that an assertion of rights through counsel amounted to an admission of guilt, when in fact that assertion "was no evidence of his guilt whatever[.]" Id. at 424 (4). In neither case did we cite the Fifth Amendment or any other statutory or constitutional provision, any court decision, or really any authority at all, and the State argues that Bird applies a mere common-law evidentiary rule and cannot say anything about Georgia's constitutional provision given that Bird predated it. It may well be correct that Bird and Russell were common-law cases. But the common law as it was understood in 1877 informs the scope of the 1877 Provision.

Consistent with that approach, other cases decided prior to the adoption of the 1877 Provision afforded protection to civil parties or third-party witnesses faced with questions the answers to which might implicate them criminally. See Pinkard v. State, 30 Ga. 757, 759 (2) (1860) (trial court properly told State's

witness he need not answer question about certain conversation if answer could incriminate him; court "should have ruled out the whole of the conversation"); Higdon, 14 Ga. 255 (gaming law requiring discovery in civil case not unconstitutional under Fifth Amendment because answers in such cases could not be used against the witness in a criminal case).

We also decided similar cases shortly after the adoption of the 1877 Provision. We said early on that the 1877 Provision meant a witness did not have to answer questions that might subject the witness to criminal prosecution, or even ones that merely "tend[ed] to degrade" the witness. See Gravett v. State, 74 Ga. 191, 199-200 (6) (1884) (relying on state constitutional provision to hold that trial court did not err by ruling that State's witness, who had testified that she had a child, did not have to answer whether she had ever been married). Less than a decade after the adoption of the 1877 Provision, citing both the Georgia and federal constitutions, we found no error in excluding depositions offered in a civil case to show that the original plaintiff (since deceased) had refused to answer questions the answers to which might implicate him in the crime of doing business on a Sunday. See Harrison v. Powers, 76 Ga. 218, 245 (6), (8) (1886). We wondered "[o]f what worth would the protection [of the right

against self-incrimination] be if a party availing himself of it incurred detriment or loss by so doing." Id. at 245 (8). And 30 years later, we again held that a witness's refusal to answer questions pursuant to the right found in the state constitution could not be admitted as evidence in a subsequent proceeding, even in a civil case. See Loewenherz v. Merchants' and Mechanics' Bank of Columbus, 144 Ga. 556 (87 SE 778) (1916) (court in civil real estate dispute erred in admitting rule nisi and answer in contempt case, which evidenced party's failure to answer questions before grand jury). We quoted that same language from Harrison, as well as an Iowa Supreme Court decision to the effect that "'[i]t would indeed be strange if the law should confer upon a witness this right as a privilege, and at the same time should permit the fact of his availing himself of it to be shown as a circumstance against him.'" Id. at 560 (quoting State v. Bailey, 6 NW 589, 590 (Iowa 1880)). One of our sister state courts relied on our decision in Loewenherz, as well as decisions from other jurisdictions, to conclude that it had "become well settled by the great weight of authority that no inference of the existence of the incriminating fact is permitted to be drawn from the witness' claim of privilege, and that therefore the witness' claim of privilege is not a proper matter of evidence for the jury's

76

consideration." State v. Weber, 199 SW 147, 148-149 (Mo. 1917) (citing Loewenherz). These decisions, coming after the adoption of the 1877 Provision, could not change its original public meaning. But, as previously discussed, their temporal proximity to its adoption makes them good indicators of its meaning.

The State argues that, to the extent the Georgia constitutional provision incorporates the Bird and Loewenherz lines of cases, such incorporation would retain a common-law limitation to refusals to testify in formal court proceedings. But those cases are not so limited. Harrison involved a refusal to answer questions in a deposition, not a formal court proceeding. 76 Ga. at 245 (6).[26] And we have never limited Paragraph XVI to compelled self-incrimination in

---

[26] Citing Simpson v. Simpson, 233 Ga. 17 (209 SE2d 611) (1974), the State suggests that we implicitly have overruled Harrison. In Simpson, a custody case, we held that there was no error in drawing a negative inference from the refusal of a party and third-party witness to answer questions about their allegedly illicit relationship. The State argues that Simpson implicitly overruled Harrison to the extent that Harrison applied a no-adverse-inference rule to a refusal to testify outside of a formal court proceeding. But Simpson made no such distinction. And to the extent Simpson impliedly overruled Harrison, it did so only to the extent that Harrison suggested that an adverse inference from one's refusal to testify in a civil case could not be drawn in that same civil case. See Simpson, 233 Ga. at 20 ("We think it is clear that no inference of guilt can be drawn from a privileged refusal to testify in a criminal case nor can the exercise of the privilege in a civil case be used in a subsequent criminal case against the party. However, these cited Georgia cases do not hold that it is impermissible to draw an unfavorable inference in a civil case from the privileged refusal to testify in that case. There is considerable authority that such an inference can be drawn in civil cases."). This makes sense — where no criminal proceeding is at issue, it is particularly difficult to argue that the State is involved in compelling a person to incriminate himself. At any rate, if we did overrule Harrison, we did so only as to circumstances not applicable here.

the context of a court proceeding. As discussed below, we have specifically applied Paragraph XVI to bar a criminal prosecution that was based on a refusal to provide incriminating evidence by the side of the road. See Aldrich, 220 Ga. 132.

Similarly helpful is a line of cases, beginning just twelve years after the adoption of the 1877 Provision, in which this Court deemed improper negative prosecutorial comment on the defendant's failure to make a statement at trial. Robinson v. State, 82 Ga. 535, 546 (9) (9 SE 528) (1889). Although we concluded that the error was rendered harmless by the court's jury instruction, we held that "counsel for the State should not argue to the jury from the omission of the accused to make a statement[.]" Id. at 535 (syllabus). This became an oft-cited rule — at least until the United States Supreme Court in Griffin held that the Fifth Amendment barred such comments even in state court trials. See, e.g., O'Dell v. State, 120 Ga. 152, 154 (4) (47 SE 577) (1904); Minor v. State, 120 Ga. 490, 490 (1) (48 SE 198) (1904); Caesar v. State, 125 Ga. 6 (53 SE 815) (1906); Barker v. State, 127 Ga. 276 (56 SE 419) (1907); Thornton v. State, 190 Ga. 783, 783-784 (1) (10 SE2d 746) (1940); Parks v. State, 208 Ga. 508, 508 (1) (67 SE2d 716) (1951); Jordan v. State, 212 Ga. 337, 338 (3) (92

SE2d 528) (1956).[27] Neither Robinson nor its progeny rely upon precursors to Paragraph XVI; rather, they appear to be common-law cases. But this suggests that the common law they apply was part of the preexisting common law that was incorporated into the 1877 Provision. The historical record in the years leading up to and shortly after Georgia adopted the 1877 Provision lead us to conclude that it prohibited admission of a defendant's refusal to speak or act as evidence against him.

D. *No subsequent developments clearly altered the meaning of the 1877 Provision.*

Of course, the 1877 Provision does not apply today; Paragraph XVI of the 1983 Constitution does. As explained in Division II, a constitutional provision — like Paragraph XVI — that is retained from a previous constitution without material change is strongly presumed to retain the original public meaning that provision had at the time it was first adopted. Thus, we presume that Paragraph XVI as it is found in the 1983 Constitution carries the same meaning as that of the 1877 Provision. Although not ironclad, this presumption is strong. As also

---

[27] Where the defendant did make a statement at trial, the prosecution was permitted to note for the jury that the defendant's statement had failed to deny some material fact established by the state's evidence. See, e.g., Howard v. State, 86 Ga. App. 85, 87-88 (2) (70 SE2d 870) (1952); Tolbert v. State, 12 Ga. App. 685, 686 (78 SE 131) (1913).

explained in Division II, a constitutional clause that is readopted into a new constitution and that has received a consistent and definitive construction is presumed to carry the same meaning as that consistent construction. But unlike the question at issue in Olevik, this second presumption does not arise regarding refusals. Although there is ample case law from which we conclude that Paragraph XVI precludes admission of a defendant's refusal to speak or act and the drawing of adverse inferences therefrom, much of that case law relates to the common law informing the original public meaning of the 1877 Provision; few of the cases were actual interpretations of the 1877 Provision of the sort necessary to support the presumption arising from a consistent and definitive construction.

In 1964, well before Georgia readopted the provision against compelled self-incrimination as part of the 1976 and 1983 Constitutions, we held that the provision precluded a conviction based on a defendant's failure to do an incriminating act — in that case, his refusal to drive his truck onto scales. See Aldrich, 220 Ga. 132. Although the applicable statute in that case went further than the one at issue here, by making refusal itself a crime, see id. at 133, our holding was consistent with an understanding that the constitutional provision

80

prohibited using refusal to support a criminal prosecution.[28]

The State relies heavily on a line of cases — since overruled at least as a matter of federal law — that allowed a jury to hear about and be charged on a defendant's silence in the face of statements made in his presence that implicated him in criminal activity, essentially as an exception to the hearsay rule. Dating back to the nineteenth century, Georgia evidence law provided that silence when the circumstances require an answer, denial, or other conduct may amount to an admission. See Code of 1860 § 3713; see also Cobb v. State, 27 Ga. 648, 697-698 (5) (1859) (upholding conviction, on the basis that the jury should hear all relevant evidence, against a challenge that the jury should not have heard that the defendant refused to confess when confronted by a jailer with a letter from a co-defendant). For a long time, we applied this tacit admission provision with little consideration of whether the circumstances might implicate either a state or federal right against compelled self-incrimination,

---

[28] A later case distinguishing Aldrich in finding no violation of the constitutional right in a conviction under a new version of the statute whereby a driver's refusal to drive his vehicle onto scales could result in a loss of license is not at odds with that understanding, given that the conviction at issue in that case was not based on the defendant's refusal to comply with a direction to drive onto the scales, but on the evidence obtained when he voluntarily complied. See Dennis v. State, 226 Ga. 341, 342-343 (1) (175 SE2d 17) (1970).

even when law enforcement was involved in the interaction that gave rise to the inference. See, e.g., Smiley v. State, 156 Ga. 60, 60 (118 SE 713) (1923) (rejecting challenge to witness's testimony that when she implicated the defendant in the crime in the presence of a deputy sheriff and the defendant, the defendant remained silent); see also Bennett v. State, 231 Ga. 458, 461-462 (2) (202 SE2d 99) (1973); Bloodworth v. State, 216 Ga. 572, 573 (3) (118 SE2d 374) (1961); Kalb v. State, 195 Ga. 544, 549-550 (2) (25 SE2d 24) (1943); McCormick v. State, 176 Ga. 21, 22-23 (1) (166 SE 762) (1932).

At one point we rejected, albeit with little analysis, a self-incrimination challenge to the tacit admission rule. Emmett v. State, 195 Ga. 517 (25 SE2d 9) (1943), involved the admissibility of testimony that the defendant failed to respond to certain statements made by a co-defendant in his presence, as well as the propriety of a jury instruction that the defendant's failure to deny the statements would amount to an admission of the statements by the defendant if the circumstances were such that "an answer or denial was required[.]" Id. at 535-537 (2). The defendant claimed that because the co-defendant's incriminating statements were made while the defendant was in jail, in the presence of a sheriff and prosecutor, and charged with assault, he had a right to

82

remain silent such that the instruction was contrary to the Fifth and Fourteenth Amendments and the 1877 Provision. Id. at 536 (2). We concluded that "in our opinion" the fact that the accused was in custody at the time of his silence did not render evidence of that silence inadmissible and that the instruction was not erroneous. Id. at 537 (2).

In at least one instance prior to the Miranda decision in 1966, however, we questioned whether the tacit admission rule was always compatible with the right against compelled self-incrimination. See Johnson v. State, 151 Ga. 21 (105 SE 603) (1921) (plurality opinion) (even if evidence at issue — a deputy's testimony that, while in jail charged with homicide, defendant did not comment upon accomplice's statements that arguably implicated her in the crime — were admissible, it was not "positive evidence of guilt" sufficient to support a guilty verdict). Ultimately, decades after the adoption of the 1945 Constitution, we at least partially overruled our tacit admission case law as irreconcilable with Miranda. See Howard v. State, 237 Ga. 471, 474-475 (228 SE2d 860) (1976) (stating that Bennett, Kalb, and Emmett must be overruled in part). In the light of Miranda, we construed the tacit admission statute as not authorizing a charge based on silence or acquiescence by a person when they are in police custody,

83

on the theory that police interrogation is not a circumstance requiring an answer or denial. Id. at 474.[29]

We did not do away with the tacit admission rule altogether. See Emmett v. State, 243 Ga. 550, 552-553 (1) (255 SE2d 23) (1979) (applying tacit admission rule and distinguishing Howard as involving custodial interrogation). Under our current Evidence Code, the tacit admission rule is embodied in OCGA § 24-8-801 (d) (2) (B), which provides that among the party-opponent admissions excluded by the hearsay rule is a "statement of which the party has manifested an adoption or belief in its truth[.]" But whatever we have said about the constitutionality of the tacit admission rule, this line of cases is not enough to rebut the presumption that Paragraph XVI precludes admission of a defendant's refusal to incriminate himself to the same extent that the 1877 Provision did. This line of cases did not hold that a defendant's silence was

---

[29] Miranda, of course, is a construction of the Fifth Amendment — not the Georgia Constitution. And it's not obvious that Howard overruled Emmett's holding as to the Georgia Constitution. Although Howard quoted the Georgia Constitution, the only articulated bases in Howard for overruling Emmett were decisions by the United States Supreme Court regarding the meaning of the United States Constitution. See Howard, 237 Ga. at 473-474; see also State v. Herrera-Bustamante, 304 Ga. 259, 265 (818 SE2d 552) (2018) ("Howard's holding was based explicitly on Miranda and other federal constitutional case law[.]"). This is a meager basis on which to conclude that we also adopted a new construction of the Georgia Constitution. In concluding that Howard does not require affirmance here, we need not and do not decide whether it overruled Emmett as a matter of state constitutional law.

*always* admissible, only that it was admissible when circumstances dictated that the defendant should have responded, rendering the silence an adoptive admission. See Emmett, 195 Ga. at 537 (2) (rejecting defendant's argument that his custodial status at the time his co-defendant made certain statements rendered his failure to deny those statements inadmissible, and that it was improper to instruct the jury that such silence could amount to an admission, but providing that "in so doing the judge should be careful to inform the jury that they are to determine whether under all the circumstances an answer or denial was required"); Graham v. State, 118 Ga. 807, 807-808 (45 SE 616) (1903). And the State does not argue that Elliott's refusal to submit to a breath test would constitute an adoptive admission excluded by the hearsay rule under our current Evidence Code.

The State argues that the United States Supreme Court in South Dakota v. Neville, 459 U. S. 553 (103 SCt 916, 74 LE2d 748) (1983), held that admission of a defendant's refusal to consent to a blood-alcohol test does not violate the Fifth Amendment, suggesting that this means we cannot conclude that refusal to submit to a breath test is "coerced" and thus that admission of that refusal is barred by Paragraph XVI. Id. at 564. But Neville's holding followed

from the Court's prior holding that undergoing a blood-alcohol test is not "of a testimonial or communicative nature" and thus is not protected by the Fifth Amendment. Schmerber, 384 U. S. at 760-765. The Court reasoned in Neville that "the values behind the Fifth Amendment are not hindered" when the state offers the suspect a choice between submitting to a blood-alcohol test that the state could legitimately compel or having his refusal used against him. Neville, 459 U. S. at 563. But our decision does not turn on the meaning of the word "coerced" as a textual matter, nor on "the values behind the Fifth Amendment," but, rather, on the meaning of the common-law right against self-incrimination when it was first enshrined into the Georgia Constitution in 1877 and then readopted in our current Constitution. Neville's understanding of what constitutes "coercion" thus is not relevant to the ultimate question before us here.

E.     *Because Elliott had the right to refuse to submit to a breath test under Paragraph XVI, admission of evidence of her refusal violates that state constitutional right against compelled self-incrimination.*

The State posits a number of additional arguments as to why evidence of Elliott's refusal to submit to a breath test should be admissible in its criminal prosecution of her. For one, the State contends that DUI cases are

86

"extraordinary" in that suspects are deemed to have waived their right to refuse a breath test in exchange for the privilege of driving on the roads of this state. But we have clearly held that the fact that an officer reads a suspect the implied consent notice and otherwise complies with implied consent procedures does not mean that the suspect gives actual and voluntary consent to a particular test for Fourth Amendment purposes. See Williams v. State, 296 Ga. 817, 822 (771 SE2d 373) (2015). Similarly, a person's mere decision to drive on the roads of Georgia does not amount to actual agreement that a refusal to consent to a breath test may be admissible in her criminal prosecution.

The State also contends that, under a strict scrutiny framework, it may use evidence of Elliott's refusal because in encroaching on any fundamental right against self-incrimination, the State is acting on a compelling interest in effectively prosecuting drunk drivers in a way that is narrowly tailored to serve that interest. But this argument would allow similar exceptions for all serious crimes; surely the State's interest in prosecuting murderers is at least as strong as its interest in prosecuting drunk drivers. The State has failed to identify any case in which we have applied strict scrutiny to Paragraph XVI or any other constitutional rule of criminal procedure. Strict scrutiny is a concept generally

invoked when statutes are challenged under the First Amendment or on equal protection or substantive due process grounds. See generally Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1268-1269 (2007). Elliott's challenge to the statute is not based on First Amendment or equal protection grounds. And although she raises due process concerns, her primary argument rests on Paragraph XVI. Where a specific constitutional amendment provides "an explicit textual source of constitutional protection against a particular sort of government behavior," the express provision, "not the more generalized notion of substantive due process," controls the analysis. Albright v. Oliver, 510 U. S. 266, 273 (114 SCt 807, 127 LE2d 114) (1994) (plurality opinion) (citation and punctuation omitted).

The State also argues that a holding that Paragraph XVI prohibits admission of a defendant's refusal to submit to a breath test would contravene Olevik's holding that the implied consent warning is not per se coercive, as well as our subsequent decisions in Fazio v. State, 302 Ga. 295 (806 SE2d 544) (2017), and Schmitz v. State, 302 Ga. 473 (807 SE2d 361) (2017), relying on Olevik to reject challenges to the implied consent notice. To the extent the State argues that our holding here is inconsistent with and nullifies Olevik, the State

88

fails to appreciate the differences between the claims decided in <u>Olevik</u> and those raised here. In <u>Olevik</u>, we resolved the defendant's claim that he was coerced into submitting to a breath test because the language of the implied consent notice did not sufficiently inform him that he was entitled to refuse. Given that argument, the consequence of refusing was not among the particular aspects of that language the defendant challenged. We rejected his argument and held that the implied consent notice sufficiently informed a defendant of the right to refuse such that the notice was not per se coercive. <u>Olevik</u>, 302 Ga. at 249-250 (3) (a). Here, we do not address whether Elliott was coerced into submitting to a breath test under Paragraph XVI, but what consequences flow from her assertion of the right to *refuse* to submit to the test. We recognize that our holding here may affect a totality-of-the-circumstances inquiry into whether a defendant voluntarily submitted to a breath test where the State first threatened that, if she refused, that would be evidence against her at trial. But that question is not presently before us.

The State's remaining arguments, citing state statutes, general principles of state criminal law, and policy concerns, fail to appreciate the constitutional nature of the right at issue. We acknowledge that the State has a considerable

interest in prosecuting DUI offenses (and thereby deterring others), and that our decision today may make that task more difficult.[30] But the State also has a compelling interest in prosecuting murders, rapes, armed robberies, and a whole host of other serious crimes, and the right to be free from compelled self-incrimination does not wax or wane based on the severity of a defendant's alleged crimes.

This Court cannot change the Georgia Constitution, even if we believe there may be good policy reasons for doing so; only the General Assembly and the people of Georgia may do that. And this Court cannot rewrite statutes. This decision may well have implications for the continuing validity of the implied consent notice as applied to breath tests, but revising that notice is a power reserved to the General Assembly. Having considered the text of Paragraph XVI and the context in which it was enacted, as well as all of the arguments made by the parties and the amici, we conclude that Paragraph XVI precludes admission

---

[30]Although as we discussed in Olevik, this Paragraph XVI analysis is limited to breath tests. See Olevik, 302 Ga. at 232, 233 n.2 ("Nothing we say here should be understood as casting any doubt on Strong's" holding that Paragraph XVI was not implicated by a blood test.).

of evidence that a suspect refused to consent to a breath test.[31] Consequently, we conclude that OCGA §§ 40-5-67.1 (b) and 40-6-392 (d) are unconstitutional to the extent that they allow a defendant's refusal to submit to a breath test to be admitted into evidence at a criminal trial.

We reverse the trial court's denial of Elliott's motion to suppress.

<u>Judgment reversed. All the Justices concur, except Warren and Ellington, JJ., disqualified.</u>

---

[31] To the extent Elliott also raises arguments under OCGA § 24-5-506 and her constitutional right to due process, we need not address them given our resolution of her argument under Paragraph XVI.

BOGGS, Justice, concurring.

I join the Court's opinion in full, but write to clarify certain implications of the Court's decision today and our earlier decision in Olevik v. State, 302 Ga. 228 (806 SE2d 505) (2017).

First, it is important to identify the provisions of the implied consent law that are not affected. As acknowledged both in the Court's opinion today and in Olevik, the scope of these decisions is limited to chemical tests of a driver's breath; they do not apply to tests of a driver's blood. Also unaffected is the core component of the implied consent enforcement scheme: the administrative license suspension provided by OCGA § 40-5-67.1 (c) and (d). Additionally, the holding that a driver's refusal to take a breath test may not be used in a *criminal* proceeding does not forbid its use in an *administrative* proceeding concerning suspension of a driver's license, and that core function of the implied consent law remains in force, notwithstanding the Court's opinions today and in Olevik.

That being said, these decisions affect significant portions of the implied consent law. The statements in the implied consent notices set forth in OCGA § 40-5-67.1 (b) — that Georgia law "requires" the driver to submit to breath

testing; that the "refusal to submit . . . may be offered into evidence" against the driver at trial; and that the driver's license "*may* be suspended" (as opposed to "shall") if the driver submits and the results indicate an alcohol concentration above a prohibited level — are likely to become problematic in future cases as a result of Olevik or the Court's decision today.[32] And it is conceivable that these decisions could affect the admission of previous DUI convictions pursuant to OCGA § 24-4-417 (a) (1). Moreover, officers are required to read the warnings in a "substantively accurate" form. Sauls v. State, 293 Ga. 165, 167-168 (744 SE2d 735) (2013), overruled in part on other grounds, Olevik, 302 Ga. at 246 (2) (c) (iv) n. 11; see OCGA § 40-5-67.1 (b) ("Such notice shall be read in its entirety but need not be read exactly so long as the substance of the notice remains unchanged."). But only the General Assembly can change what they are required to read. Thus, the General Assembly may wish to revise the provisions of the implied consent law, particularly the content of the implied consent notice.

It is also worth noting that the General Assembly and the people could

---

[32] In Olevik, we rejected the appellant's facial challenges to the implied consent notice as well as his particular as-applied challenge. But in doing so, we noted that he had pointed out "deficiencies in the implied consent notice," and further observed, "The General Assembly may wish to amend the implied consent notice statute; if it does, among the changes it may consider would be a clearer explication of the right to refuse testing, and a more accurate articulation of the likelihood of license suspension." 302 Ga. at 250 and n.14.

2

reconsider Paragraph XVI itself. The Court's opinions here and in <u>Olevik</u> discuss at length Paragraph XVI's application to incriminating acts of a defendant. This understanding of Paragraph XVI has become something of an outlier in state and federal constitutional interpretations of self-incrimination, but, as this Court observed in <u>Olevik</u> and demonstrates more fully today, it has a long history stretching back over more than a century of case law and through several Georgia Constitutions. And, of course, the amendment of a constitutional provision, particularly one of such long standing that has generated a substantial body of case law, should not be undertaken lightly. Moreover, the potential effects of such an amendment upon other areas of law should also be borne in mind. However, because the Court's decision today is rooted in a constitutional provision that was adopted by the legislature and the people, if the General Assembly and the people of Georgia see fit to take our self-incrimination law in a different direction, a clear understanding of the scope and impact of our decision here today may aid in informing their decision.

I am authorized to state that Justice Blackwell and Justice Bethel join in this concurrence.

Decided February 18, 2019.

DUI breath test; refusal; constitutional question. Clarke State Court. Before Judge Auslander.

Willis Law Firm, Gregory A. Willis, Jared T. Hall, for appellant.

Carroll R. Chisholm, Jr., Solicitor-General, William W. Fleenor, Ethan M. Makin, Assistant Solicitors-General; Kenneth W. Mauldin, District Attorney, for appellee.

Meg E. Heap, District Attorney; Miller & Key, J. Scott Key; William A. Finch, Solicitor-General, David Holmes, Samuel R. d'Entremont, Assistant Solicitors-General; Gilbert A. Crosby, Peter J. Skandalakis, Robert W. Smith, Jr.; Luftman, Heck & Associates, Daniel J. Sabol; Huey Defense Firm, Donald T. Huey, Blaise J. Katter; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, David S. McLaughlin, Senior Assistant Attorney General, Jameson B. Bilsborrow, Assistant Attorney General, Andrew A. Pinson, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General, amici curiae.